JACOB P. GOODHART *vs.* THE STATE OF CONNECTICUT.

Third Judicial District, Bridgeport, October Term, 1910.
HALL, C. J., PRENTICE, THAYER, RORABACK and WHEELER, Js.

It is well established in this State and elsewhere, that so-called adjudications of contempt by courts of competent jurisdiction are final and not reviewable upon writs of error.
As pertinent to the question of jurisdiction, however, the alleged act of contempt may be reviewed for the purpose of determining whether

Goodhart *v*. The State.

it is one which is legally susceptible of being treated as contempt; for if it is not, then the court has no jurisdiction to declare it a contempt.

Of contempts committed in its presence the court must of necessity be its own judge.

To deceive a court by untruthful statements for the purpose of securing the admission of certain testimony is unlawful and disorderly conduct, and a contempt in the face of the court.

The question whether the statement of an attorney to the court as to the purpose he had in making certain inquiries was true or false is ordinarily determinable not upon direct, tangible and clearly defined evidence, but upon subtle and impalpable considerations appealing to the trier but which are not easily susceptible of statement or review; and therefore it is only in an extreme and rare case that a reviewing court can be placed in the position of the trier, or in the true position to make a right judgment.

The facts in the present case reviewed and the conclusion of the court, that the plaintiff had made an untruthful statement to secure the admission of certain evidence, sustained. (*Two judges dissenting.*)

Submitted on briefs October 25th, 1910—decided January 24th, 1911.

WRIT OF ERROR to reverse an order of the City Court of New Haven (*Mathewson, J.*) adjudging the plaintiff guilty of contempt of court and requiring him to pay a fine of $25. *Writ dismissed.*

The record contains a copy of the order of the City Court, which shows that the plaintiff, who was counsel for the defense in a criminal case then on trial in that court, "did behave in a contemptuous and disorderly manner towards said court, by making an untruthful statement in order to secure the admission of certain evidence"; and that it was thereupon ordered "that the said Jacob P. Goodhart paӯ a fine of $25 and that he remain in the custody of the court officer until said fine is paid." The record also contains a copy of a bill of exceptions duly allowed and signed by the court, which shows what took place in court with reference to the admission of the evidence referred to prior to the adjudication of the contempt.

*E. P. Arvine*, for the plaintiff.

*Arnon A. Alling*, State's Attorney, appeared, but filed no plea or brief, and made no opposition to the writ.

THAYER, J.   If the plaintiff was guilty of that of which the record shows that he was found guilty by the court below, his conduct constituted a contempt.   The due administration of justice requires that statements to the court by attorneys and its other officers shall be such that the court may rely upon their truthfulness with absolute confidence.   The law demands this; and attorneys, when they are admitted to the bar, are required to take an oath, not only that they will do no falsehood, nor consent to any to be done in court, but that, if they shall know of any to be done, they will inform the court thereof, to the end that it may be reformed.   To deceive the court by untruthful statements for the purpose of securing the admission of testimony is unlawful and disorderly conduct, and a contempt in the face of the court.   This is not questioned by the plaintiff, nor does he question the power of the court to punish him for such a contempt if he was guilty of committing it.   The City Court of New Haven is a court of record, and it is unquestionable that in this State such a court has the inherent right to punish of its own motion, as was done in this case, contempts committed in its presence. *Middlebrook* v. *State*, 43 Conn. 257, 268; *Huntington* v. *McMahon*, 48 id. 174, 196; *Welch* v. *Barber*, 52 id. 147, 157.   The fine imposed did not exceed that which is provided by § 506 of the General Statutes as the maximum in such cases, so that, if the plaintiff was guilty, he was properly punished.

It is well established in this State, as well as in other jurisdictions, that adjudications of contempt by courts of competent jurisdiction are final, and that writs of error will not lie to review them. *Tyler* v. *Hamersley*, 44 Conn. 393, 409, and cases cited.   The reason is that such

adjudications, if they may be called such, are not judgments or awards in the nature of judgments. *Id.* 410. They are punishments imposed for offences against the court as an organ of public justice, to enable it to maintain its dignity and duly perform its functions. *State* v. *Howell*, 80 Conn. 668, 671, 69 Atl. 1057. The power to so punish is essential to a court to enable it to administer justice. Without it a court would be helpless against persons disposed to obstruct, delay, or thwart its proceedings. The power has consequently been held to be inherent in courts; and it has been held to be beyond the power of the legislature to take from the higher courts this inherent power.

From necessity the court must be its own judge of contempts committed within its presence. In such a case it may act of its own motion without any charge, formal or otherwise, being presented, without evidence, and solely upon facts within its own knowledge. If it has jurisdiction, there can be no review of its action. But if it appears from the record that the court did not have jurisdiction, as, for example, that it had no authority to impose the punishment inflicted, or that the act for which the punishment was inflicted could not constitute a contempt, the action of the court may be set aside on a writ of error. It is well settled that the rule stated in *Tyler* v. *Hamersley*, 44 Conn. 393, just recited, does not prevent a review of contempt proceedings to discover, as pertinent to the question of jurisdiction, whether the act which was adjudged one in contempt was legally susceptible of being a contempt. Lord Ellenborough, in *Burdett* v. *Abbott*, 14 East, 1, the leading case upon the subject of contempts, indicates this in clearest terms. The résumé of the authorities relied upon by the court in *Tyler* v. *Hamersley* (p. 413), as establishing its proposition, plainly shows that such was its understanding, and it proceeded to act upon that understanding

when it entered upon the consideration of what was the vital point in the case, to wit, whether Tyler's act was one which could be regarded as a contempt. This principle was recognized in *Welch* v. *Barber*, 52 Conn. 147, 156, where it was said: "The court below found that it was a contempt, and, the facts being of such a nature that it does not clearly appear as matter of law that they did not and could not constitute a contempt, we are not at liberty to revise the finding on that point." In *State* v. *Howell*, 80 Conn. 668, 69 Atl. 1057, the right of the aggrieved party to have a review for the purpose of determining whether the publications of which the alleged contempt consisted, could, under the circumstances attending them be legally regarded as being in contempt, was recognized. *McCarthy* v. *Hugo*, 82 Conn. 262, 73 Atl. 778, presents a similar situation. Numerous cases in other jurisdictions are to the same effect. *In re Watts*, 190 U. S. 1, 23 Sup. Ct. Rep. 718; *Butler* v. *Fayerweather*, 91 Fed. Rep. 458; *People ex rel. Hackley* v. *Kelly*, 24 N. Y. 74.

The bill of exceptions states all that occurred in connection with the admission of the evidence mentioned in the order, which is referred to in the statement of the case. The plaintiff contends that it appears from this bill of exceptions that he committed no act which could be construed to be a contempt, and that the court, therefore, had no jurisdiction to impose the fine upon him. We are asked to find that the court's conclusion, that it had been deceived, was based solely upon its view that no question had been asked which was admissible for the purpose for which it was asked, and that, as the evidence was admissible for the purpose for which it was offered, no conduct appears on the record which can possibly be construed to be contempt. We are thus asked to find a fact from the evidence appearing in the bill of exceptions. But we cannot, upon this bill of exceptions,

inquire whether the evidence warranted the court's find-
ing that the plaintiff's statement was untruthful. We
cannot, in any case, upon a bill of exceptions, review the
whole evidence for the purpose of determining whether
the trial court was right in its determination of a ques-
tion of fact. *Lyme* v. *East Haddam,* 14 Conn. 394, 398;
*Sharp* v. *Curtiss,* 15 id. 526, 534; *Shelton* v. *Hoadley,*
*ibid.* 535, 537; *Capen* v. *Peckham,* 35 id. 88, 91.

But it is said that we may treat the facts appearing
in the bill of exceptions as subordinate facts from which
the City Court drew the conclusion that the plaintiff
was guilty of contempt, and determine whether it was
correct in that conclusion. Where the subordinate facts
have been found by the court from the evidence, and
an inference or conclusion is drawn from such facts, we
have held that such conclusion is a conclusion of law
and can be reviewed by us. *Winsted Hosiery Co.* v. *New*
*Britain Knitting Co.,* 69 Conn. 565, 575, 38 Atl. 310;
*Nolan* v. *New York, N. H. & H. R. Co.,* 70 Conn. 159, 174,
39 Atl. 115. If, in the present case, the facts attend-
ing the proceedings in the City Court which are incor-
porated in the finding, may be treated as facts which the
judge of that court has found upon his own testimony as
an eye witness, and from which he drew the conclusion
that the plaintiff made an untruthful statement, and if,
in a contempt proceeding, we have the power to review
such conclusion for the purpose of determining whether
the City Court had jurisdiction to impose the fine, we
cannot say from the facts appearing in the record that
the court's conclusion was not warranted by those facts.

The bill of exceptions shows that one Newport was
on trial charged with assault with intent to murder. The
plaintiff appeared as counsel for him. The State, having
introduced evidence tending to prove Newport's guilt,
rested its case. The plaintiff called as his first witness
Dr. Peck, and, having proved by him that at the request

of the State's Attorney he had called to see the accused a few hours after his arrest, proceeded to question him as to what was said and done at the interview, and who were present. Objection being made, the plaintiff stated that he desired to show "the man's condition for the purpose of determining the nature and character of the assault." Further objection being made, he stated that he desired to ascertain "what this man's condition was who was found down under Mr. Webb, and to ascertain his physical condition, and further than that, from such observations as he made, what his mental condition was." After some other questions and another objection, the court said to the plaintiff: "If you, Mr. Goodhart, will say to the court you are trying to prove insanity, I shall allow you to proceed. If not, I shall exclude the question." The plaintiff replied: "My purpose is to have your honor ascertain his mental condition." The question was thereupon excluded. The plaintiff at once asked another question of the same character, and the court, upon objection, excluded the question, but, in reply to a question from the plaintiff, repeated substantially what it had said before. The plaintiff then said to the court that he was putting the witness upon the stand for the purpose of showing Newport's mental condition—that he was mentally incapable of committing a crime. He was then permitted to proceed, and did proceed at length, to show the man's physical condition, and what was done and said at the interview, including the physical examination, and what the accused said concerning the assault and what led up to it. The witness closed his examination with the statement that the accused at the time of the interview "appeared to be in a very normal attitude, neither excited nor dull. He answered my questions promptly, and his memory seemed to be good, he seemed to understand the questions and answered the questions." The court then,

having given the plaintiff an opportunity to show why he should not be fined for contempt for introducing the evidence in violation of his promise, said to him: "I allowed you to go into a certain line of evidence on your statement to me that you planned it for a certain purpose. You have not asked any question except the question of getting from the witness practically all that he knew without asking him any question that carried out your promise to me. I fine you twenty-five dollars and costs for contempt of court."

The plaintiff claims that the evidence elicited from the witness was admissible upon the question of Newport's insanity, and that it is apparent from the court's remarks in imposing the fine that it held the evidence to be inadmissible. There is a difference between admissibility and probative force as applied to testimony. The court's remarks are as consistent with a belief that the testimony did not conduce to prove Newport to be insane as with the belief that the evidence was inadmissible upon that question. The court recognized its admissibility, and received it for the purpose of proving insanity, and refused to receive it for any other. If, after weighing it, the court came to the conclusion that it had no probative force upon that question, or tended to prove the sanity rather than the insanity of the accused, that is a finding of fact which we cannot review upon this writ of error.

But the question is not as to the admissibility of the testimony to prove insanity, but whether it was offered by the plaintiff as he stated for the purpose of proving it. Admissible evidence may be offered for an improper and unworthy purpose, with no intent to prove the fact for which the evidence is admissible. In determining whether the purpose for which this evidence was offered was really that stated by the plaintiff, motive or want of motive for its introduction is an important considera-

tion. The crime charged against Newport was one which might be punished by imprisonment in the State prison. The hearing before the City Court was a preliminary inquiry. That court could merely bind the accused over to the Superior Court for trial by jury if probable cause was found to exist. It could not find him guilty or not guilty. *State* v. *Fox*, 83 Conn. 286, 295, 76 Atl. 302. It could not discharge him, or confine him upon the ground that he was insane. The plaintiff would therefore have no motive for proving Newport's insanity in the City Court. Dr. Peck had been sent by the State to examine Newport shortly after the assault. If the defense before the jury was to be insanity, the plaintiff would have a motive in learning what the State's witness would testify as to that question, and he would also have a motive to learn what declarations the accused had made as to the facts attending the assault and what led up to it. This he secured by the examination. The plaintiff's conduct when the evidence was objected to, and his shifty statements as to the purpose for which he offered the testimony, are facts warranting inferences as to the sincerity of his ultimate statement, that it was offered to prove insanity.

The question involved in this case is one of motive, intent, and good faith. Such questions are ordinarily not determinable upon direct or tangible evidence which possesses a clearly defined significance. The answer usually depends upon subtle and impalpable considerations which are not easily susceptible of statement or review. In litigation it must rest largely upon the impressions which the trier obtains from all the circumstances and indications presented by the case. Naturally those impressions may oftentimes be different upon different persons. But, whatever they are, they must, when honestly entertained, stand in all but extreme and clear cases as embodying the final legal result. Rare,

indeed, are the cases in which a reviewing court can be placed in respect to such question in the position of the trier, or in the true position to make a right judgment. This fact courts have recognized in their caution in reviewing conclusions of this character, whether of court or jury.

We cannot say, in view of the facts appearing upon the record to which reference has been made, that the conclusion of the City Court, that the plaintiff made an untruthful statement to secure the admission of evidence, was erroneous. It does not appear from the record, therefore, that the court was without jurisdiction to impose the fine.

The writ of error is dismissed.

In this opinion HALL, C. J., and PRENTICE, J., concurred.

WHEELER, J. (dissenting). The opinion of this court holds the adjudication of contempt by the City Court of New Haven reviewable in case the City Court was without jurisdiction to adjudge the contempt; and it holds in case there were no facts before it from which a contempt such as it found could have been determined, it was without such jurisdiction. And this is true, because jurisdiction by a court of the subject-matter consists not only in having jurisdiction of the class of subjects to which the claimed contempt belongs, but in having before it facts from which the adjudication of contempt may legally be made. A court has the right to adjudge an attorney in contempt for bad faith with the court, but unless there be before the court some facts which might lead to the conclusion, supported by law, that the person charged was in fact guilty of such bad faith, the court cannot so adjudge him.

The fundamental difference between the majority and

minority of the court is whether, upon the facts of record, the City Court had jurisdiction to adjudge Mr. Goodhart guilty of the contempt found.

The judgment is that in open court he did behave in a contemptuous and disorderly manner toward said court, "by making an untruthful statement in order to secure the admission of certain evidence."

We agree, if the attorney in fact made an untruthful statement, or if the conclusion of the trial judge was one of fact, and no rule of law or logic has been violated in its making, this judgment cannot be reviewed. It is not so many years since conclusions of fact in this jurisdiction were in no case reviewable; but this rule worked oftentimes serious injustice, and gradually there developed the general view that the rule ought to be modified, and, in response to what had come to be the usual and customary belief, our court, in the due and orderly way in which law grows, grafted upon the doctrine that conclusions of fact could not be reviewed certain exceptions representative of this customary belief which have become formulated in this rule. A judgment rendered upon facts found will not be reviewed unless some erroeous rule of law material to the case has been applied, or unless a material conclusion has been reached or a material inference drawn, legally or logically necessarily inconsistent with the facts, or so illogical and unsound, or so violative of the plain rules of reason, as to be unwarranted in law. *Gray's Appeal,* 80 Conn. 248, 251, 67 Atl. 891; *Spencer* v. *Merwin,* 80 Conn. 330, 337, 68 Atl. 370; *Brown* v. *Clark,* 80 Conn. 419, 423, 68 Atl. 1001; *General Hospital Society* v. *New Haven Rendering Co.,* 79 Conn. 581, 586, 65 Atl. 1065; *Metcalf* v. *Central Vermont Ry. Co.,* 78 Conn. 614, 619, 63 Atl. 633; *Hyde* v. *Mendel,* 75 Conn. 140, 143, 52 Atl. 744; *Lawler* v. *Hartford Street Ry. Co.,* 72 Conn. 74, 81, 43 Atl. 545; *Broughel* v. *Southern New England Telephone Co.,* 72 Conn. 617,

627, 45 Atl. 435; *Ryan* v. *Chelsea Paper Mfg. Co.*, 69 Conn. 454, 460, 37 Atl. 1062.

The judgment of the City Court must be upheld unless its conclusion upon the facts before it violated this rule. We think its conclusion that Mr. Goodhart was untruthful is not only illogical, but entirely inconsistent with the facts before the trial court, and found without evidence, and reached by the application of an erroneous rule of law.

The majority hold that upon the record it cannot be said as matter of law the trial court reached a conclusion so illogical, or one so without the facts before it, or so applied an erroneous rule of law, as to make its conclusion unwarranted in law. We know of no fairer way to present this question of difference than to state at length the essential facts as found by the trial court and set forth in the bill of exceptions.

One Newport was charged in the City Court of New Haven with the "crime of assault with intent to commit murder." The City Court could not determine such charge; it could find probable ground and bind the accused over to the Superior Court.

Upon the hearing on said charge, the State produced evidence tending to show that the accused was guilty as charged, and rested its case, whereupon Mr. Goodhart, attorney for Newport, called as the first witness for the defense Dr. Peck, who had been regularly subpœnaed by the State, and was duly sworn, and he testified that he, at the request of the State's Attorney, saw Newport, shortly after his arrest, at the police station, in the presence of two detectives, and, for a part of the time, of an attorney for Newport. Mr. Goodhart then inquired: "And what did you call on him for?" This question, on objection by the city attorney, was excluded, as was a similar question, despite the persistent attempt to secure its admission.

The witness then testified he asked Newport some questions, and at his request looked at his wounds, and was about to tell what he said to the detectives when Mr. Goodhart interrupted, and in the course of his remarks stated the purpose of his offer thus: "I am asking your Honor to let me have this man testify for the purpose of bringing before you—I want to know the condition he found this man in that night, his wounds, his bruises and whatever other examination he made, so that you may know what this man's condition was. You have heard the presentation of the alleged, of the assault, and I want you to know what this man's condition is for the purpose of determining the nature and character of the assault, and all the other testimony that will come in connection with it."

The question whether the doctor made an examination of the accused was renewed, and the city attorney objected because it was of no materiality, and further said: "If he is asking it for the purpose of proving insanity, he must indicate that at this time; if that is the purpose, we want to know it. If purely for the purpose of fishing around there, it is immaterial."

To this Mr. Goodhart replied in part: "I did not say that I did not know what this man was going to attempt to say: if I did not know what I understand that he would say, I would not put him on. It is very obvious what I am attempting to find out. I am attempting to find out, first, if he wishes to know, for he seems to assume that my purpose is to determine his mental condition is proper, or the attempt to: first, I want to ascertain what this man's condition was who was found down under Mr. Webb and to ascertain his physical condition, and further than that, from such observations as he made, what his mental condition was." After further discussion by counsel the court said: "Proceed with your answer." The witness then said: "I dressed New-

port's wounds and made a physical examination, and while thus engaged a gentleman who said he was Newport's counsel came in, and said he had the right to stop me, and I left."

Counsel then inquired for the details of what was done, and upon the witness saying Newport and he saluted each other and sat down, and he began questioning Newport, counsel inquired, "What was said?" This was objected to on the ground that Newport's statements could not be offered in his own favor. Mr. Goodhart replied: "I am not making any claim with respect to his commission of any offense, but only in connection with the examination. I do not care about what declarations he made about certain things, . . . why, clearly there cannot be any question about that, about my right to ascertain the nature of the examination."

Thereupon the following occurred: "The Court. The nature of the examination is proper. Mr. Hoyt. They are simply offering declarations in another way. The Court. The conversations are excluded, the nature of the examination is admitted. Mr. Goodhart. You mean what he said in response to questions that he asked concerning his condition, that those are excluded? The Court. In connection with his condition are admissible."

Further questions were asked concerning the examination, and answers elicited of little materiality, when the following occurred: " Q. Well, was that examination for the purpose of determining his condition, Doctor?" and the witness replied: "I do not see how I can answer that question satisfactorily without telling either in a general way or in detail the method of examination, which consisted first of a conversation with the prisoner, asking questions about his conduct about himself, and about his previous history and his family history. Mr. Goodhart. I claim the entire conversation then."

· This was objected to because an offer of his own declarations, and excluded.

In response to questions the witness said he did question Newport concerning his family history, as to what had happened that day, and concerning Mr. Webb and what had happened previously. The witness then testified he dressed one wound and examined others, and examined his knee jerks and found them normal. He was then asked, "Did you examine the Achilles jerks?" and replied, "I did " and was then inquired of, "What did you find?"

This was objected to because these questions could only be asked a physician for the purpose of proving insanity. The court then said: "If you, Mr. Goodhart, will say to the court you are trying to prove insanity I shall allow you to proceed." Mr. Goodhart replied: "My purpose is to have your Honor ascertain his mental condition." Thereupon the court excluded the question. Mr. Goodhart then inquired: " Did you examine his eyes? " This was objected to and excluded. Thereupon the following occurred: "Mr. Goodhart. Do I understand your Honor to say if it was for the purpose of showing his mental condition he was examined? The Court. If you plan to prove the accused was insane at the time the doctor examined him, I will admit the question. Mr. Goodhart. Well then, for the purpose of determining this evidence upon that theory, I shall, assuming one of the defenses be that of this man's incompetency at the time of his commission of the act, if I understand I may be permitted to make the examination I supposed I was entitled to. Q. Under those conditions, you may go on and state everything you did at the time, from the time you went in, Doctor? The Court. Do I understand—— Mr. Goodhart. I am putting him on the stand for the purpose of showing the man's mental condition—that he was ab-

Goodhart *v.* The State.

normal and incapable of committing a crime. The Witness. Is this in reference to the examination? Q. . . . I want you to state what you did within a few hours, what you did, what you said, and what he said to you at the time: begin at the beginning? A. . . . So I asked him about the occurrence, and he said that he went to Mr. Webb's office, and that Mr. Webb attempted to assault him, and that he shot him in self-defense. He further stated that he had on previous occasions been assaulted by Mr. Webb. Mr. Webb ran into him once in front of the post-office, and again jostled into him as he was coming out of McKee's store and then turned around and laughed at him. Q. And what? A. Laughed at him. He also said that he had made remarks at the Union League Club which had been reported, came to him. Remarks that were rather against his, Newport's, character. . . . Q. State all that took place, Doctor, everything just as nearly as you can remember? A. I can't tell exactly the words of my question, but I asked him about his divorce proceedings and he told me about that. . . . Q. Tell us all that he said about divorce? A. He said, you knew about it, did you not, and I told him I did not recollect anything specific about it. I knew there was such a proceeding in court. He said that the case was decided against him, and there was three or four, I think three thousand dollars, and he had called on Judge Shumway at his home at Danielson. . . . Q. He called on Judge Shumway there? A. Yes, and the judge told him that he had given this woman a decree of divorce, because he knew if he did not that she would keep bothering him all the time and annoying him. I asked him about his previous history. I asked him when he came to New Haven. Q. Pardon me a minute, please, Doctor, have you testified all that he said about the divorce? A. I think so. Q. During that conversation did he allude to his wife? A. Well, I do not

recall that he did.  Q. During that conversation did he allude to his child?  A. Yes.  Q. What did he say?  A. I asked him if he had any children.  Q. What did he say? A. He said he had one about eight years old.  Q. Anything further?  A. I asked him how long he had been married.  I asked him when he came to New Haven. Q. No, I refer to the child now.  A. That is all.  Q. Was anything said during that part of the conversation or before or after with respect to Mr. Webb's relationship in any way or connection with the child?  A. He said that Mr. Webb was a lawyer representing his wife in the divorce proceedings.  Q. Did he say anything about Mr. Webb and the child, so far as Mr. Webb's attitude to-toward Mr. Newport, so far as it affected Mr. Newport and the child? . . . A. I think possibly he told me that he had been allowed to see, the decree had allowed him to see the child once a week provided he paid a weekly board bill or fee for the support of the child.  I think he told me that.  Q. Anything in connection with Mr.Webb in relation to the matter?  A. No.  Q. Anything said about whether Mr. Webb had either in any way affected his right to see the child?  A. Not that I recollect. . . . Q. Anything said in which he used the expression that Mr. Webb was hounding him about the payment of money?  A. I do not recollect it.  Q. Will you say it was not?  A. I do not recollect.  I would not say. . . . Q. Did you examine the eye reflexes?  A. I did. Q. Did you ascertain his condition with respect to coördination?  A. I did.  Q. What did you find with respect to the eye reflexes?  A. I found they were normal. Q. And as to coördination?  A. Normal.  Q. Now, was there any tremor of the hands or face?  A. There was a slight tremor of the eyelids.  Q. Did you ask him his reasons for doing this act?  A. Not that I recollect.  Q. Did he offer to state to you his reasons?  A. He said that Mr. Webb attempted to assault him and that he shot him in

self-defense. Q. Did he say anything to you concerning Mr. Webb's conduct toward him other than his jostling against him and talking about him? A. He might have said he was attorney representing his wife in the divorce proceedings. . . . The Court. Repeat what he said. The Witness. He told me that on one occasion in front of the post-office, Mr. Webb had jostled against him, and on another occasion, as he was coming out of Mc-Kee's, Mr. Webb ran into him and turned around and laughed at him, and that he had heard it reported that he made remarks about him at the Union League Club. . . . Q. Did he state to you anything with respect to his claim that Mr. Webb had to do with his child's not seeing him or not seeing his child? A. I do not recollect. Q. Did you ask him? A. I do not recollect. Q. Don't you remember asking that question, do you? A. No. Q. And do not remember about his speaking of it? A. No. Q. Do you remember the subject of conversation as to Mr. Webb's being responsible for his alienation from his wife? A. I have no recollection. . . . Q. And how long did you have him under examination? A. I think about three-quarters of an hour, possibly. Q. Who was present during that time? A. Well, at first Detective Donnelly and Detective Ward, and then Mr. Donnelly went out, and after the dressings were brought to me Detective Ward went out, so while I dressed his leg there was nobody in the room. And later, during the physical examination, Mr. McKenna and Detective Ward were both present. . . . Q. Did he express any approval or disapproval of the fact of Mr. Webb's having been injured, in your presence? A. He said he shot him in self-defense. Well, further than what I said, I do not recall anything. Q. What? A. Further than what I have said I do not recall. Q. You haven't said anything? A. About his approval? Q. Did he, in fact, express approval or disapproval? A. Say he was

glad? Q. Yes, anything of that kind? A. No, I do not remember him saying anything. Q. Doctor, at the time that you had the conversation with him, did he appear excited, agitated, or did he appear cool and submissive: describe to the court, if you can? A. He appeared to be in a very normal attitude, neither excited nor dull. He answered my questions promptly, and his memory seemed to be very good, seemed to understand the questions and answered the questions.

"The Court. Now, Mr. Goodhart, do you think that your questions have followed out the line that you indicated to me when I allowed you to ask these questions?

"Mr. Goodhart. They surely do.

"The Court. I cannot see any possible connection with the questions that have been asked and the promise that you made me when I allowed you to ask these questions. I will listen to anything that you wish to say why I should not fine you for contempt.

"Mr. Goodhart. I attempted to ask this gentleman, if you mean the conclusion, I asked, if that is what your Honor refers to, from such examination as you made, Doctor, what will you say?

"The Court. I wish to ask you: you fail to answer that question.

"Mr. Goodhart. I assumed that, that that goes without saying, I assumed that from the condition, from his finding him in the condition, I assumed that would be this gentleman's, your Honor's conclusion, I will assume from his testimony he found him in a certain way.

"The Court. I allowed you to go into a certain line of evidence on your statement to me that you planned it for a certain purpose. You have not asked any question except the question of getting from this witness practically all that he knew without asking him any question that carried out your promise to me. I fine

you twenty-five dollars and costs for contempt of court.

"Mr. Goodhart. No further examination.

"Cross-examination by Mr. Hoyt.

"Q. Have you discussed this case with Mr. Goodhart and Mr. McKenna? A. I have not. Q. When were you subpœnaed in this case? A. This morning.

"The Court. Mr. Officer, take the attorney into custody until the fine is paid."

The trial court finds: "The foregoing are the facts on which the judgment for contempt against said Goodhart was rendered, a copy of which judgment is hereto annexed, marked Exhibit A." Parts of the testimony which were of little materiality or repetitions have been omitted. "The said Jacob P. Goodhart upon being taken into custody by said officer, paid said sum of twenty-five dollars, and said trial proceeded."

The bill of exceptions contains all of the facts upon which the judgment was rendered. The facts detailed are not to be interpreted by the demeanor of the attorney, the inflection of his voice, or any other circumstance, not found in the record. This court will declare the law upon the facts found: it will not find the facts.

The several offers of evidence made by Mr. Goodhart were admissible for the purposes claimed by him. What was said and done at the interview between Dr. Peck and Newport was admissible to prove the mental condition of the accused, and Newport's insanity at the time of the commission of the alleged offense was made an issue in the case.

After Mr. Goodhart had made this claim the court said: "If you, Mr. Goodhart, will say to the court you are trying to prove insanity, I shall allow you to proceed." Twice again Mr. Goodhart was required to state his claim, and from the time of his final statement down to the point when the court inquired, "Now, Mr. Goodhart, do you think that your questions have followed out

the line that you indicated when I allowed you to ask
these questions?" not an objection had been taken, nor
a ruling made by the court. And the State and the court
agreed that this evidence was admissible for the purpose
claimed.

The act of contempt is found in holding Mr. Good-
hart's statement, in response to the question of the court,
that he offered the evidence to prove insanity, to be un-
truthful, and that he thereby secured the admission of
this interview. "But," says the opinion, "the question
is not as to the admissibility of the testimony to prove
insanity, but whether it was offered by the plaintiff as
he stated for the purpose of proving it. Admissible evi-
dence may be offered for an improper and unworthy
purpose with no intent to prove the fact for which the
evidence is admissible." The opinion refers to three
considerations on which the trial court might have relied
in its conclusion: (1) That the motive of the offer was
bad. (2) That the claims of counsel in order to secure
the admission of this evidence were shifty. (3) That
the question involved is one of intent, and "subtle and
impalpable considerations" may have controlled this
conclusion.

The court argues that this was a preliminary hear-
ing, and the trial court could not find the accused guilty
or not guilty, nor discharge or confine him upon the
ground that he was insane. "The plaintiff would there-
fore have no motive for proving Newport's insanity in
the City Court." Because insanity was not an issue in
the case before that court Mr. Goodhart had no motive
in pressing it, and from his bad motive the court might
have found him untruthful in making the claim.

We are of the opinion this position is unsound. The
duty of the City Court on this hearing was to inquire
into the facts, and, if it found probable ground to exist,
bind the accused over to the Superior Court for trial, or,

if it did not find such probable ground, to discharge him. Public Acts of 1905, p. 411, Chap. 215; *State* v. *Fox*, 83 Conn. 286, 295, 76 Atl. 302. Any defense which tended to disprove the guilt of the accused he might make in the City Court, since if he could show that the crime charged had never been committed, or that he did not commit it, he would of necessity establish a want of probable ground to bind him over. To that end he might show that the assault was never made, that it was an accident or a misadventure; he might show that he was elsewhere when it was committed; he might show that he committed the assault in self-defense, or he might show that at the time he made the assault he was insane.

A vital element in the charge, "assault with intent to murder," is the specific intent; without proof of that, there is no crime. If Newport could show that he was insane at the time of the assault charged, he could not have had this specific intent, and did not commit the crime charged, and the court could not find probable ground against him. "Probable ground" and "probable cause" are synonymous terms, and Chief Justice Marshall defines probable cause in *United States* v. *Burr*, Fed. Cas. No. 14,692a (p. 12) thus: "I understand probable cause to be a case made out by proof furnishing good reason to believe that the crime alleged has been committed by the person charged with having committed it." Our practice is in harmony with this statement of the law.

Further, it is the duty of an attorney to bring to the attention of the court an accused's insanity, and the court may then appoint a guardian *ad litem* and cause steps to be taken to secure an examination of the accused. The law does not compel an insane accused to wait until he reaches the Superior Court before it ministers to his unhappy state.

If the City Court based its judgment upon the ground that Mr. Goodhart secured the admission of evidence

which the court could not consider, it was clearly in error.

The court says, if the defense before the jury was to be insanity, his counsel would have a motive to learn what the accused had said to Dr. Peck. That might be true, yet, in the absence of any finding that this was the motive of the attorney, we should be reluctant to suggest this as the motive of an officer of this court, an attorney in good standing and active practice. The trial court had before it no fact which indicated the purpose of the attorney was an untruthful one. Its ruling admitting the evidence for the purpose claimed, and the city attorney's concession that it was admissible for this purpose, ought to protect this attorney against a charge of untruthfulness in claiming the evidence to prove insanity. Moreover, the evidence offered may have tended to prove insanity, and the City Court did not have, nor has this court, the right to find the evidence was without probative force to prove insanity.

We may take judicial notice that Newport was subsequently acquitted in the Superior Court of New Haven County, on the ground of insanity, of this very charge. *Hartford* v. *New York & N. E. R. Co.*, 59 Conn. 250, 253, 22 Atl. 37; *Knight* v. *United States Land Asso.*, 142 U. S. 161, 12 Sup. Ct. Rep. 258; *Arthur* v. *Norfield Congregational Church*, 73 Conn. 718, 731, 49 Atl. 231.

From this record we may gather on what in part this defense probably rested.

The accused was a business man of New Haven. He told Dr. Peck his wife was divorced from him, and the custody of their only child awarded the wife, and he allowed to see his child once a week, provided he pay the weekly board. Mr. Webb had represented his wife in the divorce case and secured for her large alimony. He believed Webb had twice purposely run into him or jostled against him in the public street, at other times

laughed at him, and sneered at him, and made remarks damaging to his character in the club.  He told Dr. Peck that he shot Webb in his office in self-defense.

We can understand from what appears in this interview with Dr. Peck what in all probability the ultimate claims upon insanity in the trial to the jury were to be: That the accused had the delusion that Mr. Webb's course in the case had taken wife and child from him, and his feeling against Webb was so intense he became possessed with the delusion that he had treated him with indignity, and was slandering him.  This inference is aided by our knowledge that Mr. Webb is a lawyer of good standing.  That when the accused said he went to see the judge who tried the divorce case, and the judge said he had granted the decree because he knew if he did not the wife would keep bothering him all the time and annoying him, the claim of counsel was that the accused was laboring under a delusion as to what the judge told him was the ground of his decision.  This inference is aided by our knowledge of courts and of this judge.

In the light of Newport's acquittal, it must be held highly important if counsel could establish through the State's expert that Newport entertained delusions such as these just succeeding his assault upon Mr. Webb in his office; to support such a defense, it must be found that the accused held such delusions, that they or either of them were responsible for his act, and that they were insane delusions, springing from a disease of the mind. Delusions of this class are placed under the head of persecutory delusions.  *Andersen* v. *State*, 43 Conn. 514, 524.

Again, this evidence suggests that a claim might be made in behalf of this accused, that even though he was found to have had mind enough to comprehend the character and consequences of his act, if his mind was

so diseased that his will was overpowered, and he was forced or driven to shoot Webb by an uncontrollable or irresistible impulse springing from such disease of mind, he could not be convicted or bound over.

Whether the City Court would be satisfied that the defense was well taken is beside the point; it was the right of the accused to make it, and to have it fairly considered. This evidence was not claimed to be all of the evidence to prove insanity: the defense had just begun.

The court suggests as a further argument to justify its conclusion that the City Court might have found the attorney offered this evidence in bad faith, his shifty conduct in first claiming the evidence on one ground and then on another. The record discloses the City Court did not so find, nor place its decision on this ground. If it had, and our duty was to read the record to see if that supported such a conclusion, we should have to conclude it did not.

Mr. Goodhart first claimed the evidence to prove the physical condition of the accused to determine the nature and character of the assault. Then the city attorney objects, that if it's a mere fishing expedition it is immaterial; if to prove insanity, counsel should indicate that purpose. To this Mr. Goodhart replies: "If I did not know what I understand that he would say, I would not put him on . . . I am attempting to find out, first, . . . his physical condition," second, his mental condition.

The witness testifies at some length to the occurrences of the interview, when the city attorney again objected that the questions could only be asked a physician for the purpose of proving insanity, and the court said: "If you, Mr. Goodhart, will say to the court you are trying to prove insanity, I shall allow you to proceed." Mr. Goodhart again states his purpose to be to ascertain the mental condition of the accused. Upon the court's ex-

cluding a clearly admissible question, Mr. Goodhart inquired if the question was admissible to show mental condition, and the court said: "If you plan to prove the accused was insane at the time the doctor examined him, I will admit the question."

Mr. Goodhart restated his claim, and, as the court started to make the same inquiry as before, Mr. Goodhart restated his claim that he put Dr. Peck on the stand to show the accused's "mental condition—that he was abnormal and incapable of committing a crime."

To us this does not show shifty conduct on the part of the attorney, but a persistent claim of a definite purpose in the face of rather unusual obstacles.

The State admitted the admissibility of evidence of insanity, and the trial court allowed the evidence for that purpose, and, after considerable evidence had been put in in compliance with its ruling and without objection, it found the attorney untruthful in securing the admission of such evidence, and this court holds it might have so found because the evidence put in had no probative force.

We think this suggestion does the trial court a serious injustice; such a course would have impeached its fairness.

So far our research has failed to discover a recorded instance where an attorney has been found guilty of making an untruthful statement in claiming to prove evidence of the insanity of an accused when the evidence claimed was competent, relevant, and material. Nor do we find a recorded instance of a finding by a court of deceit by an attorney who sought to introduce evidence first on one ground and immediately after on an additional ground which was esteemed by the trial court to be sound.

In our opinion there was no evidence before the trial court from which it could hold this attorney's motive

bad or his conduct shifty, and the record shows indubitably that it did not determine the contempt upon such ground.

The finding of the trial court answers the suggestion that the intent may have been found from "subtle and impalpable considerations." The record says it states the facts on which the judgment was rendered, and the judgment of this court cannot go beyond that record.

Further, the question of intent is one of law if the court, in reaching that conclusion, erred either in law or in logic. *Brosty* v. *Thompson*, 79 Conn. 133, 136, 64 Atl. 1.

The judgment of the trial court was not based upon any of the suggested considerations, but upon a mistaken opinion upon the law; that is an experience of all judges and readily excusable. The finding of a bad motive or shifty conduct by an attorney in his relation with the court, without the suggestion of legitimate evidence to support either, is something for which excuse could not so readily be found.

The City Court might by a line have said its conclusion was affected by the demeanor of counsel, and so saved its judgment from successful attack; instead it told the exact truth and no more. And thereby it established its sense of fairness, which is the first requisite of the just judge.

When the direct examination of Dr. Peck was practically completed, the court said: "Now, Mr. Goodhart, do you think your questions have followed out the line that you indicated to me when I allowed you to ask these questions?" This indicates the court was of opinion the questions asked had not tended to support the claim of the attorney that he offered the evidence to prove insanity.

In this the court had a wrong conception of the law; all that was said and done by the accused at the interview

with Dr. Peck was evidence tending to show his condition of mind at the time of the assault, and we have endeavored to show this evidence may have tended to prove that the assault arose through such insane delusions or through an irresistible impulse springing from disease.

Mr. Goodhart then inquires of the court if his failure to ask the opinion of Dr. Peck was what the court had in mind, and the court replies: "You have not asked any question except the question of getting from this witness practically all that he knew without asking him any question that carried out your promise to me."

What the court terms Mr. Goodhart's promise was his claim to introduce the evidence of the interview to prove the insanity of the accused. The court could not have meant that Mr. Goodhart had promised to prove the insanity in fact from this evidence; an attorney's claim to prove a fact does not mean an absolute promise to do it. The court had in mind that ordinarily, in proving mental condition, the facts within the knowledge of the witness are presented and his opinion in the light of his knowledge asked. There is no legal obligation to take this course. The facts may be presented to be weighed by the court without the opinion, or one witness may give the facts and another, if competent, his opinion upon these facts.

The City Court was in error in ruling that the facts of the interview and examination did not tend to prove insanity, unless connected with an expression of opinion from the one testifying to the facts.

The finding of untruthfulness is not one of fact, but of law, because there are no facts found which in law can justify it, and it was found by the application of an erroneous rule of law.

When we modified our rule of law and permitted conclusions of fact to be reviewed in certain cases, we did

it to further just decisions, we adopted it for every class of actions, made it as applicable to contempt as to negligence cases.

The importance of this decision to Mr. Goodhart is great; its importance to the practicing attorney is great; and its importance to the administration of justice is greatest of all.

The attorney who defends an accused is "bound by all fair and honorable means, to present every defense that the law of the land permits, to the end that no person may be deprived of life or liberty, but by due process of law." Code of Ethics, Fifth Canon, Amer. Bar Ass'n Reports (1909), p. 1161. His oath of office compels this, as it does that in the exercise of his highest fidelity and skill for his client he shall do no act in violation of his professional integrity. An attorney who presses a legitimate defense for an accused by legitimate methods must not be in danger, while doing his duty to his client, of being found guilty of deceiving the court, else his independence will vanish, and no longer can it be said: "It is the glory of our profession that its fidelity to its client can be depended on." The independence of the lawyer is as necessary to justice as is the independence of the judge.

Maintaining its right to review a judgment of criminal contempt when the act adjudged contempt is no contempt, the court holds that it cannot examine the transcript of what occurred in the court-room as set out in the bill of exceptions in order to ascertain if there were ground of contempt, because that would be finding a fact from the evidence. "But," says the court, "we cannot, upon this bill of exceptions, inquire whether the evidence warranted the court's finding that the plaintiff's statement was untruthful. We cannot, in any case, upon a bill of exceptions, review the whole evidence for the purpose of determining whether the trial

court was right in its determination of a question of fact."

We think such a technical disposition of this case is unwarranted under our law. Writ of error is a proper method of reviewing a judgment of criminal contempt. *Tyler* v. *Hamersley*, 44 Conn. 393; *Middlebrook* v. *State*, 43 id. 257, 268.

The bill of exceptions lays before the appellate court all facts, rulings, claims, and statements relevant to whether or not the judgment from which the writ is taken is erroneous. We do not understand the court intends to hold that when a bill of exceptions shows that the court reached its conclusion without evidence, or in violation of the rules of logic or reason, or of a rule of law, that this would not present a reviewable error of law. We think the court intends to hold that it cannot on a bill of exceptions review a conclusion of fact, or the evidence which may be detailed in the bill for the purpose of reviewing a conclusion of fact. This is true generally, and no less so, and no more so, where a record embodying a bill of exceptions is brought up on a writ of error. The bill of exceptions cannot be used to review a conclusion of fact, any more than the finding on appeal can be so used, unless some rule of law or logic has been violated in reaching it.

It is well to remember that the decisions upon bills of exception which the opinion cites were rendered at a time when all conclusions of fact were final. Since then our law has been changed, as we have before shown, and necessarily that change affected every known remedy or process of procedure. It is axiomatic. A general rule of law once declared by this court becomes of universal applicability in this jurisdiction for every occasion and for every class of cases. "It is not the object or purpose of a bill of exceptions to bring up the whole case for revision, but only some particular ruling or decision of the

court that is at the time specially excepted to." *Hale* v. *Wiggins*, 33 Conn. 101, 104. The particular point specially excepted to which this bill of exceptions should fully cover, is whether the conclusion that Mr. Goodhart was untruthful is in law erroneous. The trial court has set out all the facts on which the judgment of contempt was rendered, by stating just what occurred in the court-room from the transcript of the stenographer. No suggestion has been made that any other method would have afforded equal opportunity to review the judgment of contempt. The bill of exceptions was made up in accordance with the views of the trial court. It was, we believe, in harmony with settled practice. No one claimed that the proceeding was wrong, and no one claimed that this court could not on the record decide the issues raised on their merits. The act of contempt was the making "an untruthful statement in order to secure the admission of certain evidence."

It seems self-evident, if we would know whether the attorney made an untruthful statement "in order to secure the admission of certain evidence," we must have the evidence before us, and all that led up to and formed a part of the adjudication. A finding of what the judge thought the evidence proved will not satisfy; nothing short of the evidence to secure the admission of which the attorney is found to have made an untruthful statement will satisfy.

In such a case as this, the evidence upon this point is a fact, and *the fact*, upon which the court based its conclusion. This is not a case where a conclusion is drawn from subordinate facts which the evidence supports; but a conclusion drawn from the conduct of the attorney in presenting this particular evidence. We cannot understand his conduct, nor tell whether the trial court reached its conclusion contrary to law, unless we see the evidence, and see it in its setting, as it appeared

Goodhart *v.* The State.

at the time, with the questions and answers, the objections and the claims of counsel, and the rulings and observations of the trial court.

We are in accord with the opinion of this court that questions of intent, good faith, and motive such as this, "rest largely upon the impressions which the trier obtains from all the circumstances and indications presented in the case." And only the record of what occurred at the hearing will present this, and, when the judge finds that this record is all upon which his judgment was based, it follows that this method of procedure is the only way to certainly determine the existence or nonexistence of the act adjudged a contempt.

The only acts or facts on which it has been suggested the trial court might have founded its conclusion of the untruthfulness of this attorney are these: 1. That the evidence offered was inadmissible to prove insanity, and the attorney in stating to the court he claimed the evidence on this ground might have been found untruthful. 2. That the evidence offered, though admissible, had no probative weight to prove insanity, and therefore the attorney in stating to the court he claimed the evidence on the ground of insanity might have been found untruthful. 3. That the attorney in making his various claims to secure the admission of the evidence shifted his ground, and from such conduct he might have been found untruthful. 4. That such a conclusion is a finding of intent, which rests largely upon the impressions which the trier obtains from all the circumstances and indications presented in the case.

We cannot tell whether evidence is admissible or not until we know what it is. We cannot determine the probative force of evidence unless we have it before us. We cannot say whether an attorney's conduct was shifty in making his claims of evidence unless we have the record open before us. We cannot know the circumstances

and indications of the hearing in their relation to a question of contempt such as this unless the record gives us the story of the court-room from the transcript.

In behalf of the plaintiff the claims are: 1. That all the evidence offered was admissible, and might have tended to prove physical condition or insanity as he claimed. 2. That there was no evidence or fact before the court from which it could adjudicate him in contempt. 3. That the record of the trial, in the statements of counsel and the rulings and observations of the court, shows that the ground of the judgment was the misconception of the law that the evidence offered was not admissible unless followed by the opinion of the witness.

All but the last of these considerations required a statement of the evidence, and even the last required a part of the record, and the rest is so closely explanatory it cannot be said to be improper to give it all.

The opinion holds that in presenting evidence of no probative force, the motive of the attorney is a vital consideration; but how can the probative force of the evidence, or its lack, be known, unless it be set out?

Finding a material fact without evidence—that is, a fact unsupported either by some direct testimony or by some inference which a court may properly draw from the testimony given, conduct of parties or witnesses, or other circumstances appearing in the trial—is an error of law. *Morris* v. *Winchester Repeating Arms Co.*, 73 Conn. 680, 692, 49 Atl. 180; *Standard Cement Co.* v. *Windham Nat. Bank*, 71 Conn. 668, 681, 42 Atl. 1006.

The method of presenting to this court such an error of law on appeal has under the direction of this court become settled. *Standard Cement Co.* v. *Windham Nat. Bank, supra.* The evidence bearing upon the point at issue is certified by the trial court, and from its examination we ascertain if an error of law has been made in the finding or conclusion of the trial court.

The practice on the presentation to this court of an error of law on writ of error should harmonize with the practice on appeal.

In this case the trial court made up the bill of exceptions which corresponds to the finding of facts on appeal, it stated its conclusion, and it incorporated the evidence bearing thereon, and it certified that its judgment was rendered upon these facts. No better or simpler method could have been adopted. Would it have improved the opportunity of this court to make its review had the evidence been separated from the bill of exceptions and certified independently? In reality the method pursued was an adaptation of the practice on appeals, supported by a finding of facts, to the practice on writs of error, supported by a bill of exceptions. It made for simplicity of practice, and the great present need of the profession is to spend less time on adjective and more on substantive law.

We have preferred to treat this case as if the judgment had been properly framed, and hence the conclusion of the judgment properly in issue.

Lest our failure to refer to it may be taken as an acquiescence by us in the form of this judgment, we will briefly refer to its insufficiency as a legal judgment.

Proceedings in contempt are of a criminal nature; *Church* v. *Pearne*, 75 Conn. 350, 353, 53 Atl. 955; and "proceedings for the punishment of contempts should generally conform as nearly as possible to proceedings in criminal cases." *McCarthy* v. *Hugo*, 82 Conn. 262, 266, 73 Atl. 778; *Hurley* v. *Commonwealth*, 188 Mass. 443, 74 N. E. 677; *Bessette* v. *Conkey Co.*, 194 U. S. 324, 24 Sup. Ct. Rep. 665.

In criminal judgments no intendments or presumptions can be indulged in to sustain the judgment of the trial court. *Crites* v. *State*, 74 Neb. 687, 691, 105 N. W. 469.

Goodhart *v*. The State.

In a judgment for constructive criminal contempt, the judgment may set out the facts, or, by reference to the pleadings, make them a part of it; in any event, it is essential that the jurisdiction of the court appear on the face of the judgment, by making the facts, directly or by reference, a part thereof.

If the contempt be direct, for an act done in the presence of the court, since there is no written charge or complaint, there is no opportunity for one found guilty to properly protect his rights, unless the facts found are spread upon the judgment-file.

. The statement of the ultimate conclusion will not enable the reviewing court to determine whether the court had jurisdiction to adjudge the contempt. In this case the general conclusion only is stated in the judgment, and without the bill of exceptions it would be impossible to know whether the judgment were good or bad. Our practice has been to state in the judgment the facts upon which its conclusion was based. This we believe to be not only the best practice, but the only practice to properly guard the rights of one found guilty of a contempt.

In *Crites* v. *State*, 74 Neb. 687, 691, 105 N. W. 469, the court say: "This was a summary proceeding to punish an alleged contempt committed in the presence of the court. No written charge or complaint was filed, which the accused could examine and attack, and no evidence was taken or submitted to establish the charge, which the accused could combat or explain. In such a case it is absolutely necessary for the preservation of the liberties of the citizen that, in recording the conviction, the court shall state the facts showing the contempt charged. It is not sufficient to state in a general way the conclusions of fact on which the conclusion is based. The facts themselves must be stated, from which the reviewing court can see that the ultimate fact of guilty is

Goodhart *v.* The State.

properly and justly found."   *Otis* v. *Superior Court,* 148 Cal. 129, 82 Pac. 853; 4 Ency. of Plead. & Pr. p. 797.

Heretofore we have required actions of criminal contempt to conform as nearly as possible to proceedings in criminal cases. *Church* v. *Pearne,* 75 Conn. 350, 53 Atl. 955, furnishes an example of the strictness of our former requirements.

We have referred to the record of contempt in this case as a judgment, as we believe it to be under the law, and thus followed the title given it by the City Court as well as in our practice generally. We have not deemed it of importance to attempt to controvert the court's conclusion that the record of the contempt is not a judgment. Whether it be called an adjudication, a judgment, an award in the nature of a judgment, or an order, does not in the least change its character, or deny to this court the right of review when the court had no jurisdiction to find the contempt.

The nature of this case makes permissible in conclusion a general observation. A court created by the legislature, whether a higher or lower court, may be controlled by the Act of its origin, and by that Act, or subsequent legislative Acts, its power to punish for contempt may be limited. The denial of the right of review of a judgment for criminal contempt by a court of competent jurisdiction has not seemed to some of our State courts vitally necessary to the preservation of the just dignity and authority of the court, and they have departed from the common-law rule. It may be conceded that perhaps too great weight has been given to the necessity for holding such judgments for contempt conclusive, but this doctrine is of immemorial antiquity, and cannot be reversed by judicial decision. A reversal of this rule would mean more than a change in procedure or an addition to existing remedies: it would mean the uprooting of the long-settled principle of the law that

the power of a court of competent jurisdiction over its own judgments for criminal contempt is final and conclusive.

In many of our States legislation has provided for a review of judgments of criminal contempt. There are, however, certain limitations upon the authority of the legislature over such a matter.

A remedy by legislation for a review of judgments of courts created by the Constitution must of necessity be confined to errors of law; conclusions of fact as found by the trial court, unless some error of law has been made in their finding, are final and cannot be reviewed; and it must recognize the limitations upon its authority over courts created by the Constitution; and, whether the court be created by Constitution or legislature it ought to recognize that the court's right to summarily punish, upon its own knowledge, for contempts committed in its presence, is essential to its usefulness and vital to its existence in the administration of justice.

There is manifest error, and the judgment of contempt should be reversed.

In this opinion RORABACK, J., concurred.