WISE, Justice.
AltaPointe Health Systems, Inc. (“AHS”), appeals from the Mobile Probate Court’s order finding it in contempt of the probate court’s April 27, 2010, “Order of Outpatient Commitment” for Donald Ber-noudy based on AHS’s failure to comply with § 22-52-10.3(e), Ala.Code 1975. For the reasons stated in this opinion, we dismiss the appeal.

Facts and Procedural History

The probate court’s order of outpatient commitment for Bernoudy, entered on April 27, 2010, stated, in pertinent part:
“The Court shall conduct one or more status hearings with regard to the status of [Bernoudy’s] outpatient treatment in accordance with the Court’s General Order Number One dated February 23, 2010 in Case Number 2010-0362. The first status hearing is set for May 26, 2010 at 11:30 o’clock a.m. in the Mezzanine Court Room, Mobile Government Plaza, Mobile, AL 36644. [AHS] shall designate a representative who is familiar with [Bernoudy’s] outpatient treatment status to attend these status hearings and offer a completed ‘Outpatient Commitment Status Hearing Report’ and evidence to the Court as outlined in the Court’s General Order Number One dated February 23, 2010 in Case Number 2010-0362.”
The order specifically stated that the probate court retained jurisdiction over the cause “for such other proceedings and orders as may become appropriate.”
On May 24, 2010, in response to the probate court’s order, Marcia Joiner, a therapist with AHS, filed an “Outpatient Commitment Status Hearing Report.” In that report, Joiner indicated that Bernou-dy had refused an injection and had failed to attend scheduled appointments. On May 26, 2010, the probate court conducted a status hearing. The court determined that Bernoudy was not compliant with the April 27, 2010, outpatient-commitment order; scheduled another status hearing for May 27, 2010; ordered a representative of AHS to attend the hearing; ordered the sheriff to take Bernoudy into custody and to bring him to the hearing; and appointed a guardian ad litem for Bernoudy. Ber-noudy did not appear at the May 27, 2010, *141 hearing because the sheriffs office was unable to locate him.
After the May 27, 2010, hearing, the probate court determined that Bernoudy was noncompliant with his treatment plan. The court also determined the following:
“7. Testimony offered at the May 27, 2010 hearing suggests that the persons directly responsible for [Bernoudy’s] treatment were aware of said ongoing non-compliance and took no action to notify the Court of said non-compliance or to timely respond to said non-compliance.
“8. Ala.Code § 22-52-10.3 (1975) requires AHS, as the designated mental health facility, to immediately notify and report to the Court material noncompliance with an outpatient commitment order by a respondent subject to such order.
“9. As of the date of this Order, [Bernoudy’s] whereabouts are still unknown and no report of material noncompliance has been submitted to the Court.
“10. Good cause exists for the Court to require AHS to show cause as to why it should not be held in contempt of Court for its failure to comply with the provisions of Ala.Code § 22-52-10.3 (1975).”
On June 15, 2010, the Mobile County Sheriffs Department located Bernoudy and took him into custody. On June 16, 2010, the probate court entered an order in which it found that Bernoudy posed a real and present threat of substantial harm to himself and/or to members of the general public. After consulting with Bernoudy, Bernoudy’s guardian ad litem consented to Bernoudy’s being detained and evaluated at the adult-evaluation unit of BayPointe Hospital. The probate court then suspended the April 27, 2010, outpatient-commitment order.
On June 21, 2010, the probate court conducted a status hearing regarding Ber-noudy and then reinstated its April 27, 2010, order of outpatient commitment.
Subsequently, on July 20, 2010, the probate court conducted a show-cause hearing at which AHS was required to show cause as to why it should not be held in contempt for failing to comply with § 22-52-10.3, Ala.Code 1975. On August 3, 2010, the probate court entered its “Finding of Fact, Conclusions of Law and Order on Citation to Show Cause,” in which it found AHS in contempt. In its order, the probate court stated, in pertinent part:
“1. The Court has expressed concern on numerous occasions during the past seven (7) years about AHS’s failure to report to the Court instances of material noncompliance of respondents in outpatient commitment causes, which is required by Ala.Code § 22-52-10.3 (1975). It appears that this failure is due to: (A) the means by which AHS chooses to provide treatment to persons under a mandatory treatment order, (B) AHS’s internal policy that only a physician can diagnose material noncompliance and consequently, if, for whatever reason a physician is unable to examine a respondent, then no determination of material noncompliance can be made by AHS, and (C) AHS’s refusal to provide a ‘mental health liaison’ who would be a means of communication between AHS and the Court, as many Alabama community mental health providers provide the probate courts of the counties where these providers operate.
[[Image here]]
“5. Because AHS is a quasi-public entity and the majority of its funding is public in nature, the Court has been reluctant in the past to monetarily penalize AHS for its failure to comply with *142 the provisions of Ala.Code § 22-52-10.3 (1975) and the Court chose a different alternative to try to address the problem.
“6. Because of the myriad of problems being reported and noted with regard to respondents who were under outpatient commitment orders rendered by the Court and the failure and/or refusal of AHS to address and work towards resolution of these problems, the Court instituted a status report/docket procedure in October 2006. This was the Court’s means of trying to become better informed about the status of respondents under the Court’s order for outpatient treatment and to try to avoid situations where respondents under outpatient commitment orders were non-compliant with treatment in the community and possibly posing a threat of harm to themselves or members of the public. The other two compelling reasons for the status report docket procedure were: (A) seeing that respondents under the Court’s order for mandatory outpatient treatment were afforded the treatment they required; and (B) seeing that the Court’s orders were being complied with.
[[Image here]]
“8. On numerous occasions during the past seven (7) years, multiple designated representatives of AHS (all mental health professionals) have testified before the Court in a number of mental health commitment proceedings that AHS has an established practice and procedure in regards to how AHS provides treatment to persons ordered by the Court to undergo outpatient treatment. This practice and procedure has uniformly been described as follows:
“A. The respondent is to have direct contact with the respondent’s assigned AHS ‘case manager’ three times each calendar week.
“B. The respondent is to come to a designated AHS clinic every two weeks for a therapy session.
“C. The respondent is to come to a designated AHS clinic once every four weeks for examination by an AHS physician.”
The probate court then proceeded to summarize previous cases concerning Bernou-dy, who it referred to as “a long time mental health consumer, who is well known to the Court and should be well known to AHS.” The court focused particularly on case no. 2008-1371:
“11. The Court’s records concerning [Bernoudy] in Case Number 2008-1371 reflect that: (A) in May 2008 [Bernoudy] appeared at BayPointe Hospital (‘Bay-Pointe’), which is owned and operated by AHS, and was delusional and psychotic; (B) [Bernoudy] sought voluntary admission to BayPointe, which was denied by BayPointe; and (C) one of BayPointe’s administrators caused [Bernoudy] to be arrested by the City of Mobile Police Department and taken to the Mobile Metro Jail.
“12. The Court’s records concerning [Bernoudy] in Case Number 2008-1371 reflect that [Bernoudy] was held in the Mobile Metro Jail from May 21, 2008, until June 3, 2008, and that [Bernoudy] appeared before the Mobile Municipal Court on June 10, 2008, with regard to the charge proffered by the BayPointe administrator. At the hearing conducted by the Mobile Municipal Court, [Ber-noudy] was reported as being very unstable and psychotic. Robert Carlock, the assistant director of BayPointe at the time, filed an involuntary commitment petition with the Court concerning [Bernoudy] at the request of the Mobile *143 Municipal Judge, with a request for emergency detention.
“13. The Court’s records concerning [Bernoudy] in Case Number 2008-1371 reflect that: (A) on June 10, 2008, the Court entered an emergency detention order, which provided for [Bernoudy] to be detained and evaluated at BayPointe; (B) a probable cause hearing was held in said cause on June 11, 2008, with probable cause being determined to exist; (C) [Bernoudy] was further detained at Bay-Pointe until June 17, 2008, when the Court conducted a merit hearing; and (D) at the June 17, 2008 hearing Bay-Pointe’s evaluation team diagnosed [Bernoudy] as suffering from ‘bipolar disorder most recent manic, severe with psychotic features’ with a recommendation of inpatient treatment and commitment to the Alabama Department of Mental Health.... ”
On April 12, 2010, Courtney Davis, Ber-noudy’s spouse, initiated the instant cause by filing in the probate court a verified petition prepared by AHS. Davis’s petition was accompanied by an intake worksheet completed by the AHS employee who prepared Davis’s petition. The intake worksheet enumerated Bernoudy’s mental-health issues, including a statement that he “posed a threat of harm to self, others and exhibited violent behaviors.”
On April 27, 2010, the probate court entered its order of outpatient commitment, which stated, in pertinent part:
“[Bernoudy] is hereby COMMITTED to outpatient treatment at AltaPointe Health Systems for treatment for a time period not to exceed 150 days, subject to renewal upon petition and hearing, with the condition that [Bernoudy] shall follow the directions and treatment plan as established by the said designated mental health facility.”
At the time the April 27, 2010, outpatient-commitment order was entered, the probate court had in a place a general order dated February 23, 2010 (“the 2010 general order”).[1] The 2010 general order provided that AHS was to make a monthly status report to the probate court concerning Bernoudy. Pursuant to the 2010 general order, AHS was required to furnish the probate court with a copy of the treatment plan AHS had formulated for Ber-noudy. On May 4, 2010, AHS filed a copy of Bernoudy’s treatment plan with the probate court. According to the probate court, the treatment plan noted that Ber-noudy “had a history of being noncompli-ant with treatment, being noncompliant with medications, and daily usage of mari *144 juana” and that Bernoudy “had limited insight and limited judgment.” Under the treatment plan Bernoudy would meet with his assigned therapist twice each month, meet with a nurse twice a month for the administration and monitoring of medication, and be examined by a physician once each month. The probate court noted that “[t]his treatment plan is consistent with AHS’s general practice and procedure .... ”
AHS submitted a status report to the probate court concerning Bernoudy dated May 24, 2010, and the probate court conducted a status hearing on May 26, 2010. Regarding the May 24, 2010, status report, the probate court stated in its order finding AHS guilty of contempt:
“The May 24, 2010 status report was the first communication from AHS to the Court that would enable the Court (pursuant to its own independent review of the report) to become aware that there were problems with [Bernoudyj’s treatment and care.
“25. In the May 24, 2010 status report, AHS represented and/or reported the following to the Court through its designated representative, Joiner, [Ber-noudy’s] assigned therapist:
“A. A written treatment plan had been formulated for [Bernoudy] in conformity with the Alabama Department of Mental Health’s standards or other applicable law.
“B. [Bernoudy’s] treatment plan had not been modified.
“C. [Bernoudy] had been prescribed medication for his mental illness.
“D. [Bernoudy] was not compliant with taking prescribed medications, with a comment that [Bernoudy] had failed to come into office for scheduled appointment with doctor.
“E. [Bernoudy] had been prescribed therapy for his mental illness.
“F. [Bernoudy] was not compliant with prescribed therapy.
“G. [Bernoudy] was not participating in a co-occurring mental illness and substance abuse treatment program.
“H. [Bernoudy] was still mentally ill and still required treatment.
“I. There had been no change in [Bernoudy’s] diagnosis.
“J. [Bernoudy] had not been engaged in any self-injurious behavior since the April 27, 2010 merit hearing.
“K. [Bernoudy] had not reported any suicidal and/or homicidal ideations since the April 27, 2010 merit hearing.
“L. [Bernoudy] was last examined by Dr. [Florin] Ghelmez at Bay-Pointe on April 27, 2010 and [Ber-noudy’s] next scheduled appointment of an AHS physician was scheduled for June 15, 2010.
“M. [Bernoudy] failed to attend more than one scheduled therapy and physician appointments.
“N. The last direct contact an AHS staff member had with [Bernoudy] was on May 7, 2010.
“O. There had been no contact between AHS staff and [Bernoudy’s] family.
“P. AHS recommended continuing to try to engage [Bernoudy] in treatment.
“26. At the May 26, 2010 status hearing, the testimony presented by Joiner reflected that [Bernoudy] had not been compliant with [Bernoudy’s] treatment plan since May 7, 2010. However, despite all of this data, AHS didn’t report to the Court that [Bernoudy] was materially noncompliant with the Court’s *145 Order Of Outpatient Commitment dated April 27, 2010. In fact, at no time during the pendency of this cause has AHS reported to the Court that [Bernoudy] was materially noncompliant with either AHS’s April 28, 2010 treatment plan or the Court’s April 27, 2010 Order Of Outpatient Commitment.”
The probate court ordered a second status hearing to be held on May 27, 2010, and the sheriff of Mobile County was directed to take Bernoudy into custody for appearance at the status hearing. A guardian ad litem was appointed for Bernoudy. Because the sheriff was unable to locate Ber-noudy, he was not present at the May 27, 2010, status hearing.
According to the probate court, Joiner’s testimony at the May 27, 2010, status hearing
“reflected again that [Bernoudy] was not compliant and had not been compliant on an ongoing basis with the provisions of the Court’s April 27, 2010 Order since May 7, 2010, when [Bernoudy] left AHS’s clinic without receiving his psychiatric medication injection. Joiner testified that she didn’t learn of [Ber-noudy’s] refusal to take his injectable medication until May 8, 2010.”
In its contempt order, the probate court summarized Joiner’s testimony concerning AHS’s standing procedure for contact between AHS staff and patients under an outpatient-commitment order:
“A. Case manager makes contact with the respondent 3 times per week,
“B. Therapist meets with respondent 2 times each month, and
“C. Physician sees respondent once each month.”
According to the probate court, Joiner also testified that
“(A) AHS would not report to the Court an instance of material noncompliance with regard to a respondent under an outpatient commitment order of the Court until the respondent had been assessed, notwithstanding the fact that the respondent may have missed numerous appointments with AHS staff; (B) AHS does not have a standing practice or policy in the instance of where a respondent willfully ignores treatment, within some specified time period AHS will file a motion to revoke outpatient commitment; and (C) she wasn’t aware that the Code of Alabama required AHS to immediately notify and report to the Court the material noncompliance of a respondent under an outpatient commitment order.”
On June 10, 2010, the probate court issued an order directing AHS to show cause as to whether AHS should be held in contempt for failure to comply with § 22-52-10.3, Ala.Code 1975, in failing to notify and report to the probate court that Ber-noudy was materially noncompliant with the probate court’s outpatient-commitment order. The show-cause hearing was scheduled for July 20, 2010. The probate court’s order finding AHS in contempt summarized that hearing as follows:
“43. At the July 20, 2010 hearing, AHS presented three witnesses. Joiner, Jennifer Strickland (‘Strickland’) and Dr. Sandra Parker (‘Parker’). Joiner, noted above as being an AHS therapist assigned to AHS’s Bridge Team, was [Bernoudy’s] assigned therapist initially. Strickland supervises AHS’s Bridge Team and is Joiner’s supervisor. Parker is the medical director of AHS.
[[Image here]]
“45. At the July 20, 2010 hearing, Joiner testified that on May 10, 2010 Joiner prepared a status report ... concerning [Bernoudy] to be submitted to *146 the Court. Joiner testified that she submitted said status report to Strickland, who sent it to the Court by facsimile. This testimony differs from Joiner’s earlier testimony, when Joiner testified that the May 24, 2010 report was the first report filed with the Court in this cause. At the July 20th hearing Joiner testified that [Bernoudy] called AHS on May 18, 2010 and requested to reschedule his physician’s visit from May 18, 2010 until June 15, 2010. This was not shared at the earlier hearings. Additionally, at the July 20th hearing, Joiner testified that [Bernoudy’s] case manager spoke with [Bernoudy’s] mother on May 24, 2010 and [Bernoudy’s] mother stated that [Bernoudy] didn’t appear to be dangerous to himself or to others. This wasn’t shared with the Court at the earlier status hearings.
“46. At the July 20, 2010 hearing, Joiner also testified that based on her long-term relationship with [Bernoudy], Joiner expected [Bernoudy] to eventually become engaged in treatment. Joiner also testified that [Bernoudy] had an aversion to law enforcement officers and courts and said aversion was a factor in terms of [Bernoudy] not being compliant with AHS’s treatment plan prior to [Bernoudy] being taken into custody on June 15, 2010.
“47. Joiner’s testimony noted in the preceding paragraph is perplexing based on the events preceding [Bernoudy’s] 2008 involuntary commitment proceeding. ... Further, said testimony is perplexing because [Bernoudy] was not engaged in treatment from January 2009 until the instant cause was initiated over a year thereafter.
“48. Strickland testified that she submitted a status report (AHS Exhibit T) concerning [Bernoudy] by facsimile to the Court ... on May 10, 2010. No explanation was offered as to why AHS would submit a status report concerning [Bernoudy] on May 10, 2010, when the status hearing was scheduled for May 26, 2010. AHS Exhibit T was not filed with the Court and the Court has no record of receiving the alleged facsimile. Review of AHS Exhibit Number 1 reflects no court filing notation or stamp. Further, review of said exhibit reflects that AHS Exhibit ‘1’ doesn’t contain any marking by the Court that said report was received by the Court via facsimile or any AHS facsimile machine generated confirmation legend or ‘confirmation sheet’ reflecting the time, date or number of pages allegedly sent to the Court.
“49. Review of AHS Exhibit T reflects that even if the Court had received AHS Exhibit ‘1’, such report would not constitute notice to the Court that [Bernoudy] was materially noncom-pliant with treatment or with the Court’s April 27, 2010, Order Of Outpatient Commitment (the same being true with regard to the May 24, 2010 status report).
“50. Strickland testified that during the treatment team’s staff meetings regarding [Bernoudy] during the months of May and June, 2010 nothing unusual was mentioned by members of the team concerning [Bernoudy], although it was reported by the case manager that the case manager had lost contact with [Ber-noudy]. Strickland testified that there was no indication from [Bernoudy] or anyone else that [Bernoudy] was unstable.
[[Image here]]
“52. Parker testified that: (A) AHS is prohibited by the [Alabama Department of Mental Health] from requiring a consumer to undergo treatment — even in instances where a probate court orders outpatient commitment and treat *147 ment; (B) [Bernoudy] had the legal right to not participate in any treatment plan AHS may design for [Bernoudy] (even when [Bernoudy] is the subject of the Court’s order for such treatment); (C) AHS has no standard treatment approach to any consumer who is under the Court’s outpatient commitment order and that all of the AHS employees who had previously testified that such an approach existed were wrong; (D) Parker thought it was counter-therapeutic for [Bernoudy] to be present at the July 20, 2010 hearing because some years ago [Bernoudy] expressed fears of the police and the legal system; (E) while no AHS employee had any direct contact with [Bernoudy] from May 8, 2010 until June 15, 2010 and only very limited direct telephone contact with [Bernoudy] and members of [Bernoudy’s] family, [Ber-noudy] was not psychiatrieally unstable on June 15, 2010, when [Bernoudy] was taken into custody by the Mobile County Sheriffs Department; and (F) [Bernou-dy] didn’t pose a danger to himself or others on June 15, 2010.”
The probate court then summarized AHS’s “response and position”:
“A. Until AHS’s staff could directly assess [Bernoudy], AHS could not represent to the Court that [Ber-noudy] was materially non-compliant with treatment.
“B. Since AHS’s staff couldn’t assess [Bernoudy] from May 7, 2010 until June 15, 2010, it was appropriate for AHS to not report to the Court that [Bernoudy] had not complied with [Bernoudy’s] treatment plan during said time period.
“C. Since AHS’s staff couldn’t assess [Bernoudy] from May 7, 2010, until June 15, 2010, it is not appropriate for the Court to hold AHS in contempt for failure to comply with Ala.Code § 22-52-10.3 (1975) and to notify and report to the Court that [Bernoudy] was materially non-compliant with the Court’s April 27, 2010, Order of Outpatient Commitment.
“D. AHS didn’t intend to violate Alabama law.
“54. The testimony of AHS’s witnesses also revealed the following:
“A. AHS has no corporate definition for ‘material non-compliance.’ AHS asserts that each consumer must be evaluated individually and clinical decisions will differ consumer by consumer.
“B. AHS has provided no training to its staff as to what constitutes ‘material noncompliance.’
“C. Parker, who is AHS’s medical director, has no supervision over AHS’s outpatient treatment program.”
In finding AHS in contempt, the probate court reasoned:
“Ala.Code § 22-52-10.3 (1975) provides the structure for court-ordered (thus mandatory) outpatient treatment. These include the following requirements: (1) the treatment will be provided by a ‘designated mental health facility1; (2) the designated mental health facility consents to treat [Bernoudy] on an outpatient basis under the terms and conditions set forth by the probate court; (3) the probate court may state the specific conditions to be followed and shall include the general condition that [Bernoudy] follow the directives and treatment plan established by the designated mental health facility; (4) outpatient treatment shall not exceed 150 days; (5) the designated mental health facility shall immediately report to the probate court any material noncompli- *148 anee with the outpatient commitment order.
“In the instant cause the Court stated specific conditions to be followed by [Bernoudy] and AHS, i.e., [Bernoudy] shall follow the directions and treatment plan established by AHS. It is undisputed that AHS formulated an outpatient treatment plan for [Bernoudy], to which [Bernoudy] agreed on April 28, 2010.
“The Court feels compelled to note that AHS fails to appreciate the fact that court-ordered treatment means mandatory treatment, i.e., [Bernoudy] doesn’t have a choice. If after an outpatient commitment order is issued, AHS believes that: (A) a respondent was incorrectly diagnosed as having a serious mental illness (such that treatment is not needed) or (B) a respondent’s circumstance changes to the point that court-ordered treatment is no longer necessary or appropriate, AHS should communicate said views to the Court and it becomes the responsibility of the Court to determine if the outpatient commitment order should be modified or vacated altogether. Obviously, no one wants anyone to be the subject of a court order requiring mandatory treatment, when such isn’t necessary for both legal and practical reasons.
[[Image here]]
“It should also be noted that AHS’s approach — as expressed by Parker, results in two of the three necessary components for the concept of outpatient commitment to work ... to be missing. The failure to address these two components results in a program that can be harmful to both respondents and the general public.
“Finally, Parker’s testimony reflects a certain air of arrogance on Parker’s part in that Parker advocates that the entire commitment process is clinically oriented (and thus only medical experts can make decisions).... Parker (and AHS) has obstinately failed to recognize the role of the Court (or any court for that matter) in the commitment process. Yes, clinical impressions and diagnoses are factors in terms of whether a person subject to an outpatient commitment order are in material compliance with said order. But there are other factors to be considered as well. Ultimately the determination of material noncompliance with an order of the court is a legal decision to be made by the court that issued the order.
“... [I]t is clear that AHS has a standard practice and procedure that is utilized by AHS with regard to scheduling treatment for persons subject to outpatient commitment orders....
“Notwithstanding Parker’s testimony, it is clear that [Bernoudy’s] treatment plan was in accord with AHS’s standard practice and procedure that is utilized by AHS....”
The probate court then detailed the manner in which it found that Bernoudy had failed to comply with his treatment plan and the manner in which AHS had failed to comply with the court’s outpatient-commitment order:
“[Bernoudy] materially failed to comply with [Bernoudy’s] treatment plan between May 7 and June 15, 2010.
“[Bernoudy] was not engaged in active treatment- or service by AHS from May 8 through June 15, 2010. .
“AHS’s staff assigned to manage and provide outpatient treatment to [Ber-noudy] was aware on May 8, 2010, that [Bernoudy] had failed to comply with [Bernoudy’s] treatment plan in a material manner. This awareness continued during the ensuing weeks until June 15, *149 2010, when [Bernoudy] was taken into custody.
[[Image here]]
“[Bernoudy] became materially non-compliant with the Court’s April 27, 2010, Outpatient Commitment Order, on or after May 7, 2010. Said noncompliance continued until June 15, 2010.
“AHS’s staff assigned to [Bernoudy] knew or should have known that [Ber-noudy] was materially non-compliant with the Court’s April 27, 2010 Outpatient Commitment Order on May 7, 2010, and continuing until June 15, 2010.
“AHS failed to report to the Court that [Bernoudy] failed to materially comply with the Court’s Order Of Outpatient Commitment dated April 27, 2010.
“The Court is of the opinion, and therefore concludes, that AHS failed to comply with the provisions of Ala.Code § 22-52-10.3(e) in this cause.
“The Court is of the opinion, and therefore concludes, that AHS is in contempt of the Court’s April 27, 2010 Order in this cause.”

Discussion

AHS argues on appeal that the probate court erred in finding that it was in contempt for failing to comply with § 22-52-10.3(e).
A.
The probate court stated that it was finding AHS in contempt of its April 27, 2010, outpatient-commitment order because AHS had failed to comply with § 22-52-10.3(e), Ala.Code 1975, which provides, in pertinent part:[2]
“The designated mental health facility shall immediately report to the probate court any material noncompliance with the outpatient treatment order. The report shall set forth the need for revocation of the outpatient treatment order and shall be verified and filed with the probate court.”
AHS contends that “[c]ourts may issue contempt orders for noncompliance with court orders but not with past violations of statutes or regulations.” (AHS’s brief, at p. 31.) The probate court argues that AHS is precluded from raising this argument on appeal because, it says, AHS did not first present this argument to the probate court. Therefore, we must initially determine whether this issue can be properly raised for the first time on appeal.
“There are three prerequisites to the trial court’s use of the contempt power to protect its proceedings from interference: (1) jurisdiction over an underlying legal proceeding;[4] (2) jurisdiction over the subject matter — the contempt;[5] and (3) jurisdiction over the person— the contemnor. Robertson v. State, 20 Ala.App. 514, 526, 104 So. 561, 573 (1924) (citing Ex parte Creasy, 243 Mo. 679, 699, 148 S.W. 914, 920 (1912)). To the extent there has been interference with a court’s judicial proceeding, that court has subject matter jurisdiction over that interference. By virtue of the interference, the trial court has personal jurisdiction over any person who is a significant cause of that interference. An assessment of each of these elements should be set forth in the trial court’s order or in transcripts of a hearing, to facilitate proper appellate review. ...
*150 [[Image here]]
Ex parte Segrest, 718 So.2d 1, 6 (Ala.1998) (emphasis added; footnote omitted). The following statutes are applicable to a probate court’s contempt jurisdiction: §§ 12-1-7, 12-1-8, 12-1-10, and 12-13-9, Ala. Code 1975. Section 12-1-7 provides:
“Every court shall have power:
“(1) To preserve and enforce order in its immediate presence and as near thereto as is necessary to prevent interruption, disturbance or hindrance to its proceedings;
“(2) To enforce order before a person or body empowered to conduct a judicial investigation under its authority;
“(3) To compel obedience to its judgments, orders and process and to orders of a judge out of court, in an action or proceeding therein;
“(4) To control, in furtherance of justice, the conduct of its officers and all other persons connected with a judicial proceeding before it in every matter appertaining thereto;
“(5) To administer oaths in an action or proceeding pending therein and in all other cases where it may be necessary in the exercise of its powers and duties; and
“(6) To amend and control its process and orders so as to make them conformable to law and justice.”
(Emphasis added.) However, § 12-1-8, Ala.Code 1975, provides:
“The powers of the several courts in this state to issue attachments and inflict summary punishment for contempts shall not extend to any other cases than:
“(1) Disrespectful, contemptuous or insolent behavior in court, tending in any way to diminish or impair the respect due to judicial tribunals or to interrupt the due course of trial;
“(2) A breach of the peace, boisterous conduct, violent disturbance or any other act calculated to disturb or obstruct the administration of justice, *151 committed in the presence of the court or so near thereto as to have that effect;
“(3) The misbehavior of any officer of the court in his official transactions or the disobedience or resistance of any officer of the court, party, juror, witness or any other person to any lawful writ, process, order, rule, decree or command thereof,
“(4) Deceit or the abuse of the process of the proceedings of the court by any person or party or any unlawful interference with the process or proceedings of the court;
“(5) Refusing to be sworn or to answer, either in the court or before the grand jury, any lawful question as a witness or garnishee;
“(6) When summoned as a juror in a court, improperly conversing with a party to an action to be tried at such court or with any other person in relation to the merits of such action or receiving a communication from a party or other person, in respect to it, without immediately disclosing the same to the court; or
“(7) Conversing with a juror, knowing him to be such, in relation to the merits of any action which he is engaged in the trial of or supplying any juror with refreshments of any kind, except water, during the time he is engaged in the trial of any cause, without leave of the court.”
(Emphasis added.) Section 12-1-10, Ala. Code 1975, provides that “[t]he courts of this state may punish for contempt as provided by law.” Finally, § 12-13-9, Ala. Code 1975, provides:
“The probate court may issue show cause orders and attachment for con-tempts offered to the court or its process by any executor, administrator, guardian or other person and may punish the same by fine not exceeding $20.00 and imprisonment not exceeding 24 hours, or both.”
In McCollum v. Birmingham Post Co., 259 Ala. 88, 96, 65 So.2d 689, 696 (1953), this Court stated: “All courts have the power to inflict punishment for contempt for the causes specified in section 2, Title 13, Code>[3] which is also limited to those causes.” Finally, “[pjunishment for contempt must be limited to that conduct stipulated in the statute [Title 13, § 2, Code of Alabama 1940, now § 12-1-8], and must not be extended to cases involving personality conflicts.” Brutkiewicz v. State, 280 Ala. 218, 219, 191 So.2d 222, 224 (1966).
Other jurisdictions have also held that the question whether a particular act or a particular set of facts constitutes a contempt is a jurisdictional matter. In Ex parte Steiner, 202 F. 419, 420-21 (2d Cir.1913), the United States Court of Appeals for the Second Circuit stated:
“The petition also challenged the jurisdiction of the court on the ground that the offenses charged were not con-tempts within section 268 of the Judicial Code (formerly section 725, U.S. Rev. St. (U.S.Comp.St.1901, p. 583)) which reads as follows:
“‘Sec. 268. (Power to administer oaths and punish contempts.) The said courts shall have power to impose and administer all necessary oaths, and to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority: Provided, that such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their pres *152 ence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any such officer, or by any party, juror, witness, or other person to any lawful writ, process, order, rule, decree, or command of the said courts.’
“... It is frequently difficult to determine whether a decision involves mere error or is without the jurisdiction of the court. We are satisfied that the power to punish for contempt by imprisonment under the foregoing section does involve the question of the jurisdiction of the court as distinguished from mere error. The right of the court to punish at all depends upon whether the alleged contempt falls within the definition contained in the statute.”
(Emphasis added.)
Further, in Griffith v. People ex rel. Boatright, 74 Colo. 197, 198, 219 P. 1072, 1072 (1923), the Supreme Court of Colorado stated:
“It appears that the court found that the petition itself stated no action which constituted contempt of court. The court’s finding of contempt was a ground not mentioned or suggested in the petition. This court is committed to the doctrine that on a review of a judgment of this kind the only question is that of jurisdiction. Cooper v. People, 13 Colo. 337, 373, 22 Pac. 790, 6 L.R.A. 430 [ (1889) ]. And further that if the petition or complaint upon which the proceeding is based fails to allege facts which if true, constitute contempt, the court acquires no jurisdiction. Coulter v. People, 53 Colo. 40, 123 Pac. 647 [(1912) ].”
(Emphasis added.) See also Wyatt v. People, 17 Colo. 252, 256, 28 P. 961, 962 (1892) (holding that “[i]f, as a matter of fact, the act complained of constituted no contempt, the court is without jurisdiction to find the party guilty, and its judgment will be set aside by the proper appellate tribunal”).
In Ex parte Le Mond, 295 Mo. 586, 595-96, 245 S.W. 1057, 1059 (1922), the Missouri Supreme Court stated:
“It is argued by learned counsel for respondent, however, relying upon State ex inf. Crow v. Shepherd, 177 Mo. 205, 76 S.W. 79, 99 Am. St. Rep. 624 [ (1903) ], that the Legislature has no power to take away, abridge, impair, limit, or regulate the power of courts of record to punish for contempt and that therefore section 1553, R.S. 1919, is not applicable. The contempt considered in the Shepherd Case, supra, was one involving the scandalization and villification of this court by charges made in a newspaper published by defendant. What was there ruled was that courts of record have inherent power, which cannot be abridged by the Legislature, to punish contempt summarily. To this ruling we adhere. Another doctrine which must be borne in mind, however, is that it is essential to the power to punish for contempt, that the court have jmisdiction both of the subject-matter and the person punished, as well as authority to render a judgment on the facts adduced. 13 C.J. 47; Ex parte Coffee, 72 Tex.Cr.R. 209, 161 S.W. 975 [ (1913) ]; In re Northern, 18 Cal.App. 52, 121 Pac. 1010 [ (1912) ].”
(Emphasis added.) Further, in Ex parte Coffee, 72 Tex.Crim. 209, 211, 161 S.W. 975, 976 (1913), the Court of Criminal Appeals of Texas stated:
“We have an unbroken line of authorities since the Degener Case, 30 Tex.App. 566, 17 S.W. 1111 [ (1891) ], to the effect that three things must occur in order to authorize the court to fine for contempt:
*153 First, jurisdiction of the subject-matter; second, jurisdiction of the person; and, third, the authority of the court to render a judgment upon the facts adduced. In other words, that, having jurisdiction of the person and subject-matter, there must be authority in the court to render a judgment upon the facts which form the basis or predicate for the judgment, and, if no judgment would be justified under the given state of facts, then the judgment ivould be void and subject to be set aside under habeas corpus; and the rule is further laid down that we can go behind the judgment of the court to ascertain these facts.”
(Emphasis added.) See also Ex parte Duncan, 42 Tex.Crim. 661, 672, 62 S.W. 758, 761 (1901) (holding that “‘the court must not only have jurisdiction over the person and the matter, but authority to render the particular judgment’ ”; that the question of the authority of the court to render a judgment and any other matter that would render the proceedings void was open to inquiry; and that “ ‘if, upon a review of the whole record, it appears that a judgment unwarranted by law was entered, the party thus placed in contempt will be released under the writ of habeas corpus’ ”). Additionally, in Goodhart v. State, 84 Conn. 60, 78 A. 853 (1911), the Supreme Court of Errors of Connecticut stated:
“The power to punish is essential to a court to enable it to administer justice. Without it a court will be helpless against persons disposed to obstruct, delay, or thwart its proceedings. The power has consequently been held to be inherent in courts. And it has been held to be beyond the power of the Legislature to take from the higher courts this inherent power.
“From necessity the court must be its own judge of contempts committed within its presence. In such a case it may act of its own motion without any charge, formal or otherwise, being presented, without evidence and solely upon facts within its own knowledge. If it has jurisdiction, there can be no review of its action. But if it appears from the record that the court did not have jurisdiction, as, for example, that it had no authority to impose the punishment inflicted, or that the act for which the punishment was inflicted could not constitute a contempt, the action of the court may be set aside on a writ of error. It is well settled that the rule stated in Tyler v. Hamersley, 44 Conn. 393, 26 Am. Rep. 471 [ (1877) ], just recited, does not prevent a review of contempt proceedings to discover as pertinent to the question of jurisdiction, whether the act which was adjudged one in contempt was legally susceptible of being contempt. Lord Ellenborough in Burdett v. Abbott, 14 East, 1, the leading case upon the subject of contempts, indicates this in clearest terms. The ré-sumé of the authorities relied upon by the court in Tyler v. Hamersley, at page 413 of 44 Conn., 26 Am. Rep. 471, as establishing its proposition plainly shows that such was its understanding, and it proceeded to act upon that understanding when it entered upon the consideration of what was the vital point in the case, to wit, whether Tyler’s act was one which could be regarded as a contempt. This principle was recognized in Welch v. Barber, 52 Conn. 147, 156, 52 Am. Rep. 567 [ (1884) ], where it was said: ‘The court below found that it was a contempt, and, the facts being of such a nature that it does not clearly appear as a matter of law that they did not and could not constitute a contempt, we are not at liberty to revise the finding on that point.’ In State v. Howell, 80 Conn. 668, 69 Atl. 1057 [(1908)], the *154 right of the aggrieved party to have a review for the purpose of determining whether the publications of which the alleged contempt consisted could under the circumstances attending them be legally regarded as being in contempt was recognized. McCarthy v. Hugo, 82 Conn. 262, 73 Atl. 778 [(1909)], presents a similar situation. Numerous cases in other jurisdictions are to the same effect. In re Watts, 190 U.S. 1, 23 Sup.Ct. 718, 47 L.Ed. 933 [(1903)]; Butler v. Fayerweather, 91 Fed. 459, 33 C.C.A. 625 [ (1899) ]; People v. Kelly, 24 N.Y. 74 [ (1861) ].”
(Emphasis added.) See also Investors Title Ins. Co. v. Herzig, 785 N.W.2d 863, 875-76 (2010) (holding that “[c]ourts have inherent powers to impose contempt, although the Legislature may limit the categories to which contempt orders apply'’); Mowrer v. Superior Court, 3 Cal.App.3d 223, 229, 83 Cal.Rptr. 125, 128 (1969) (holding that “[w]hether petitioner’s acts constituted a contempt is jurisdictional, and in the absence of a recital of facts sufficient to constitute a contempt, the order adjudging the petitioner in contempt must be annulled”); Wilde v. Superior Court of San Diego Cnty., 53 Cal.App.2d 168, 178-79, 127 P.2d 560, 565-66 (1942) (holding that “[j]urisdiction of the court in contempt cases ... depends on the existence of evidence showing that an actual contempt of court has been committed” and that “[i]n the absence of such evidence a court pronouncing a judgment of contempt lacks jurisdiction and its order should be annulled”).
In Alabama, “[t]he jurisdiction of the probate court is limited to the matters submitted to it by statute. Mosely v. Tuthill, 45 Ala. 621 (1871); McCaa v. Grant, 43 Ala. 262 (1869). Compare Broughton v. Merchants National Bank of Mobile, 476 So.2d 97 (Ala.1985).” Wallace v. State, 507 So.2d 466, 468 (Ala.1987). Further, § 12-1-8, Ala.Code 1975, sets forth the subject-matter jurisdiction for the courts of this State with regard to contempt proceedings. See McCollum, supra; Brutkiewicz, supra. Therefore, the issue whether, under § 12-1-8, Ala.Code 1975, a violation of a statute can support a finding of contempt goes to the issue whether the probate court had subject-matter jurisdiction over the contempt in this case. “Lack of subject matter jurisdiction may not be waived by the parties and it is the duty of an appellate court to consider lack of subject matter jurisdiction ex mero motu.” Ex parte Smith, 438 So.2d 766, 768 (Ala.1983).
“We will review the issue of subject-matter jurisdiction even when the issue was not raised in the lower court because ‘[t]he question of jurisdiction is always fundamental.’ Mobile & Gulf R.R. v. Crocker, 455 So.2d 829, 831 (Ala. 1984).
“ ‘[I]f there is an absence of jurisdiction over either the person, or the subject matter, a court has no power to act, and jurisdiction over the subject matter cannot be created by waiver or consent. Rinehart, etc. v. Reliance Life Ins. Co. of Georgia, 272 Ala. 93, 128 So.2d 503 [ (Ala.1961) ]. Absence of jurisdiction over the subject matter ends all inquiry, and the matter may be raised on appeal.’
“Norton v. Liddell, 280 Ala. 353, 356, 194 So.2d 514, 517 (1967). See also Talton Telecomm. Corp. v. Coleman, 665 So.2d 914, 916-18 (Ala.1995).”
Flannigan v. Jordan, 871 So.2d 767, 768-69 (Ala.2003). Accordingly, the issue whether the probate court had the authority to find AHS in contempt for violating a statute is properly before this Court even though the issue is raised for the first time on appeal.
*155 Now that we have determined that the issue is properly before us, we must determine whether a violation of a statute can support a finding of contempt. Sections 12-1-7(8) and 12-1-8(8), Ala.Code 1975, specifically empower a judge to compel obedience to its judgments, orders, and process and to hold an officer of the court, party, juror, witness, or any other person in contempt for failing to comply with, disobeying, or resisting “any lawful writ, process, order, rule, decree or command thereof.” However, nothing in § 12-1-7, § 12-1-8, § 12-1-10, or § 12-13-9, Ala. Code 1975, provides that a court may hold a party or person in contempt for failing to comply with a statute.
Further, Rule 70A, Ala. R. Civ. P., provides, in pertinent part:
“(1) Scope. This rule shall apply to all civil or criminal contempt proceedings arising out of civil actions.
“(2) Definitions.
“(A) ‘Direct contempt’ means disorderly or insolent behavior or other misconduct committed in open court, in the presence of the judge, that disturbs the court’s business, where all of the essential elements of the misconduct occur in the presence of the court and are actually observed by the court, and where immediate action is essential to prevent diminution of the court’s dignity and authority before the public.
“(B) ‘Constructive contempt’ means any criminal or civil contempt other than a direct contempt.
“(C) ‘Criminal contempt’ means either
“(i) Misconduct of any person that obstructs the administration of justice and that is committed either in the court’s presence or so near thereto as to interrupt, disturb, or hinder its proceedings, or
“(ii) Willful disobedience or resistance of any person to a court’s lawful writ, subpoena, process, order, rule, or command, where the dominant purpose of the finding of contempt is to punish the contem-nor.
“(D) ‘Civil contempt’ means willful, continuing failure or refusal of any person to comply with a court’s lawful writ, subpoena, process, order, rule, or command that by its nature is still capable of being complied with.”
(Emphasis added.) Importantly, “[a] person cannot be held in contempt for failure to do something the court has not ordered. Price v. McAllister, 537 So.2d 43 (Ala.Civ.App.1988).” Blackston v. Blackston, 607 So.2d 1262, 1264 (Ala.Civ.App.1992).
Based on the foregoing, it is clear that, regardless of whether a contempt in a civil case such as this one is classified as criminal or civil, the purpose of a contempt proceeding is to provide a court with a method for compelling compliance with its orders or the orders of another judge and to punish those who willfully disobey or resist any such orders. Therefore, a violation of a statute, without more, would not be a proper ground for a finding of contempt.
B.
In its brief to this Court, the probate court argues:
“All orders of outpatient commitment, including the April 27 Order of Outpatient commitment in this action, originate from and are governed by § 22-52-10.3.
“The issuance of orders for outpatient treatment necessarily incorporates all provisions of the statute which authorizes and governs the order, including the requirement to report any material non *156 compliance. The order cannot be separated from the statutory requirements which authorize its issuance. The statutory reporting requirement is an integral part of the order as without the reporting requirement the order can be ignored without the Court’s knowledge. The very purpose of the order, to provide necessary treatment to the mentally ill, would be thwarted.
“The Contempt Order issued by the Probate Court finds AHS in contempt of the April 27 Order of Outpatient Treatment due to a failure to comply with the statutory duty to report material noncompliance — a duty which is inherent to and an integral part of the order.”
(Probate court’s brief, at p. 39.) The probate court’s April 27, 2010, outpatient-commitment order did not specifically order AHS to report immediately to the court if Bernoudy became noncompliant with his treatment plan. Also, the order did not specifically reference § 22-52-10.3(e), Ala. Code 1975. Therefore, we must determine whether a probate court’s outpatient-commitment order necessarily incorporates the reporting requirement set forth in § 22-52-10.3, Ala.Code 1975, so that the failure of a designated mental-health facility to report a respondent’s material noncompliance with a treatment plan would necessarily constitute a violation of the commitment order.
Section 22-52-10.3, Ala.Code 1975, provides, in pertinent part:
“(a) At the final hearing on a petition for commitment seeking the involuntary commitment of a respondent, the probate court may order that respondent participate in outpatient treatment provided by a designated mental health facility.
“(b) The probate court shall not order outpatient treatment unless the designated mental health facility has consented to treat the respondent on an outpatient basis under the terms and conditions set forth by the probate court.
“(c) If outpatient treatment is ordered, the order of the probate court may state the specific conditions to be followed and shall include the general condition that the respondent follow the directives and treatment plan established by the designated mental health facility.
“(d) Pursuant to this section, an order for outpatient treatment shall not exceed 150 days.
“(e) The designated mental health facility shall immediately report to the probate court any material noncompliance with the outpatient treatment order. The report shall set forth the need for revocation of the outpatient treatment order and shall be verified and filed with the probate court.
“(f) The probate court shall set a hearing to consider the motion for revocation of the outpatient treatment order. The hearing procedures and safeguards set forth in this article, applicable to a petition for involuntary commitment, shall be followed. If at the hearing, the probate court finds, based upon clear and convincing evidence, that the conditions of outpatient treatment have not been met, and that the respondent meets inpatient criteria, the probate court may enter an order for commitment to inpatient treatment.”
(Emphasis added.)
“This case involves the construction of several statutory provisions and a determination of their import based upon the interplay of those provisions. Thus, we employ the rules of statutory construction.
*157 “ ‘ “It is this Court’s responsibility to give effect to the legislative intent whenever that intent is manifested. State v. Union Tank Car Co., 281 Ala. 246, 248, 201 So.2d 402, 403 (1967). When interpreting a statute, this Court must read the statute as a whole because statutory language depends on context; we will presume that the Legislature knew the meaning of the words it used when it enacted the statute. Ex parte Jackson, 614 So.2d 405, 406-07 (Ala.1993). Additionally, when a term is not defined in a statute, the commonly accepted definition of the term should be applied. Republic Steel Corp. v. Horn, 268 Ala. 279, 281, 105 So.2d 446, 447 (1958). Furthermore, we must give the words in a statute their plain, ordinary, and commonly understood meaning, and where plain language is used we must interpret it to mean exactly what it says. Ex parte Shelby County Health Care Auth., 850 So.2d 332 (Ala.2002).”
“ ‘Bean Dredging, L.L.C. v. Alabama Dep’t of Revenue, 855 So.2d 513, 517 (Ala.2003). In addition, “ ‘ “ ‘[t]here is a presumption that every word, sentence, or provision [of a statute] was intended for some useful purpose, has some force and effect, and that some effect is to be given to each, and also that no superfluous words or provisions were used.” ’ ” ’ Surtees v. VFJ Ventures, Inc., 8 So.3d 950, 970 (Ala. Civ.App.2008) (quoting Ex parte Uniroyal Tire Co., 779 So.2d 227, 236 (Ala.2000), quoting in turn other cases).’
“IEC Arab Alabama, Inc. v. City of Arab, 7 So.3d 370, 375 (Ala.Civ.App.2008).”
Green Tree-AL LLC v. Dominion Res., L.L.C., [Ms. 2100187, September 9, 2011] — So.3d -, - (Ala.Civ.App.2011).
If the probate court’s outpatient-commitment order necessarily and automatically includes all the provisions in § 22-52-10.3, Ala.Code 1975, because such an order is authorized by that section, there would be no need for a probate court to “include the general condition that the respondent follow the directives and treatment plan established by the designated mental health facility” in an outpatient-commitment order. Rather, such a condition would be implicit in every outpatient-commitment order. In other words, if the legislature had intended that every outpatient-commitment order entered incorporated all the provisions of that statute, the language that such an order “shall include the general condition that the respondent follow the directives and treatment plan established by the designated mental health facility” would be unnecessary, without meaning, and have no force and effect. Applying the rules of statutory construction set forth in Green Tree-AL, supra, we conclude that the probate court’s argument in this regard is unavailing.
The probate court’s frustration in this case is understandable. However, it is clear that the probate court did not find AHS in contempt because it had not complied with a specific provision of its April 27, 2010, outpatient-commitment order. Rather, the probate court found AHS in contempt because it had not complied with the reporting provisions set forth in § 22-53-10.3(e), Ala.Code 1975. However, as we discussed in Part A of this opinion, a violation of a statute is not a proper ground for a finding of contempt. See §§ 12-1-7, 12-1-8, 12-1-10, and 12-13-9, Ala.Code 1975. See also Rule 70A, Ala. R. Civ. P.; Ex parte Griffith, supra; and Blackston, supra. Therefore, the probate *158 court did not have subject-matter jurisdiction in this case. “ ‘A judgment entered by a court lacking subject-matter jurisdiction is absolutely void and will not support an appeal; an appellate court must dismiss an attempted appeal from such a void judgment.’ Vann v. Cook, 989 So.2d 556, 559 (Ala.Civ.App.2008).” MPQ, Inc. v. Birmingham Realty Co., 78 So.3d 391, 394 (Ala.2011). Accordingly, we dismiss this appeal with instructions that the probate court set aside its August 3, 2010, order finding AHS in contempt.
APPEAL DISMISSED WITH INSTRUCTIONS.
WOODALL, STUART, PARKER, and MAIN, JJ., concur.
SHAW, J., concurs in the result.
MURDOCK, J., dissents.
MALONE, C.J., recuses himself.

. On December 7, 2007, the probate court entered "General Order Number One” ("the 2007 general order”), in which it, among other things, defined material noncompliance, ordered AHS to report material noncompliance within specific time periods, and required AHS to submit status reports and to appoint a representative to attend status hearings. The order was to become effective on January 8, 2008. On January 8, 2008, AHS filed a petition for a writ of mandamus in which it asked the circuit court to require the probate court to vacate the 2007 general order. On February 23, 2010, while the mandamus petition was pending in the circuit court, the probate court entered an order vacating the 2007 general order. On that same date, the probate court entered the 2010 general order, which still contained provisions regarding AHS’s duty to report material noncompliance, defined noncompliance, and required AHS to submit status reports and to appoint a representative to attend status hearings. On June 15, 2010, the circuit court granted AHS’s petition for a writ of mandamus, and the probate court appealed the circuit court's decision to this Court. On October 7, 2011, this Court affirmed, without opinion, the circuit court’s order granting AHS’s petition for a writ of mandamus. See Davis v. AltaPointe Health Sys., Inc. (No. 1091361, October 7, 2011), — So.3d - (Ala.2011) (table).

. In its brief to this Court, the probate court specifically states that its finding of contempt was not based on AHS's failure to comply with the 2010 general order. (Probate court's brief, at p. 34.)

" 4 This Court has previously held that parties to a proceeding as to which the trial court lacked jurisdiction were not within the contempt jurisdiction of the court. See State v. Thomas, 550 So.2d 1067 (Ala. 1989). The power to protect the orderly and efficient administration of judicial proceedings does not extend to interference in proceedings that are extrajurisdictional and illegal. See Board of Revenue v. Merrill, 193 Ala. 521, 68 So. 971 (1915); see generally, P.H. Vartanian, Annotation, Right to Punish for Contempt for Failure to Obey Court Order or Decree Either Beyond Power or Jurisdiction of Court or Merely Erroneous, 12 A.L.R.2d 1059 (1950).

"5 We note that ‘contemptuous interference' may take many forms. ‘Indirect’ interference may consist of willful disobedience or resistance to orders or process of the court. In re Tarpley, 293 Ala. 137, 300 So.2d 409 (1974). ‘Direct’ interference may take several forms, including:
“ '(1) Disrespectful, contemptuous or insolent behavior in court, tending in any way to diminish or impair the respect due to judicial tribunals or to interrupt the due course of trial;
" ‘(2) A breach of the peace, boisterous conduct, violent disturbance or any other act calculated to disturb or obstruct the administration of justice, committed in the presence of the court or so near thereto as to have that effect;
" ‘(3) The misbehavior of any officer of the court in his official transactions or the disobedience or resistance of any officer of the court, party, juror, witness or any other person to any lawful writ, process, order, rule, decree or command thereof;
" '(4) Deceit or the abuse of the process of the proceedings of the court by any person or party or any unlawful interference with the process or proceedings of the court.
"Ala.Code 1975, § 12-1-8.”

. Title 13, § 2, Code of Alabama 1940, was the precursor to § 12-1-8.